ESTRIN CONSTRUCTION COMPANY,
INC., Appellant,

v.

The AETNA CASUALTY AND SURETY
COMPANY, Respondent.

No. WD 31323.

Missouri Court of Appeals,
Western District.

Feb. 2, 1981.

Motion for Rehearing and/or Transfer to
Supreme Court Denied March 2, 1981.

Application to Transfer Denied
April 6, 1981.

Arthur H. Stoup and Thomas E. Thompson, Kansas City, for appellant.

John R. Gibson and C. Michael Mattix, Morrison, Hecker, Curtis, Kuder & Parrish, Kansas City, for respondent.

Before TURNAGE, P. J., and SHANGLER and MANFORD, JJ.

SHANGLER, Judge.

The Estrin Construction Company sued Aetna Casualty and Surety Company for the costs and damages incurred from the refusal by Aetna to defend an action for negligence brought against Estrin under a comprehensive general liability policy issued by Aetna. The court found that coverage was excluded and entered judgment for Aetna.

The plaintiff Estrin as general contractor was engaged by Mi-Mo Investment Company to construct a warehouse for lease to a

manufacturer according to designs and specifications of architect Morris. Estrin subcontracted the masonry and steel work on the walls to Keystone Masonry Company. The Estrin work activity was insured against builders risk and general liability to comply with the general conditions of the contract. Estrin insured the builders risk with Home Insurance Company and the general liability with Aetna. In the course of construction, a heavy wind toppled some of the unfinished wall construction. The damage—some $26,500—was presented to Home and paid under the builders risk coverage. The walls were rebuilt to the original plan and stood at the time of trial.

In due course, Home, as subrogee of Estrin and the others under the builders risk coverage, sued the architect Morris and subcontractor Keystone Masonry for the amount paid to Estrin under the builders risk coverage for the wall collapse. Home alleged three counts for recovery: Count I was against both defendants, Morris and Keystone Masonry on the theory of *res ipsa loquitur.* Count II alleged negligence against subcontractor Keystone singularly. Count III alleged against architect Morris singularly, not only the *negligent design* and specifications for the walls, but for failure to obtain or ensure that the subcontractor Keystone had acquired builders risk coverage as required by contract of performance. The architect Morris, in turn, brought a third-party petition against Estrin to indemnify Morris as architect [as agreed by the general conditions of contract] against all loss or liability incurred for destruction of property from the negligence of the contractor or subcontractor. Estrin tendered the defense of the Morris third-party petition to Aetna under the comprehensive liability policy, but Aetna declined on the contention there was no coverage. Estrin then engaged private counsel to defend the third-party action. The suit was ultimately determined in favor of Estrin. The cost of defense and counsel fee, some $11,000, was borne by Estrin.

The litigation on appeal is the separate action by Estrin to recover from Aetna the cost of the defense of the Morris third-party

petition, a defense due Estrin [so the assertion goes] under the terms of insurance contract. The suit seeks also to recover the cost of the prosecution of the separate action enhanced by the statutory penalty for vexatious nonpayment. The court determined that Estrin was precluded from the cause of action by two express exclusions from coverage.

The rights of the parties rest on the terms of a Comprehensive Liability Policy as augmented by a Contractual Liability Coverage Endorsement issued by Aetna to the Estrin Construction Company.

The comprehensive liability policy by Coverage D obligated Aetna to pay for property damage caused by accident for which Estrin was legally liable. That undertaking to insure was subject to formal Exclusions:

This policy does not apply:

.　　.　　.　　.　　.

(j) under coverage D, to injury to or destruction of (1) property owned or occupied by or rented to the Insured, or ... (3) ... property in the care, custody or control of the Insured or property as to which the Insured for any purpose is exercising physical control.

The court found from the evidence that the collapse of the wall was a loss as to property both *occupied* and *in the custody or control* of the general contractor Estrin and so excluded from Coverage D.

The contractual liability coverage endorsement undertook to pay for property damage caused by accident for which Estrin assumed the liability *under any written contract.* That undertaking to insure was subject to formal Exclusions:

This endorsement does not apply:

(a) if the Insured or indemnitee is an architect [and] injury ... or destruction aris[es] out of defects in maps, plans, designs or specifications prepared, acquired or used by the Insured or indemnitee.

The court found from the evidence that Morris, the proffered indemnitee under the

third-party petition, was an architect and so excluded from the coverage of the endorsement.

■ The written contract under which Morris claims indemnity from Estrin—[and Estrin, in turn, a defense from Aetna under the contractual liability endorsement to the Morris third-party petition]—is the *General Conditions* document of the *Contract of Construction*. The general contractor Estrin undertakes by the terms of agreement, among other things, to "indemnify and hold harmless" the architect from liability for injury to person or property "from execution of work provided for in [the] contract." Aetna contends that the contractual liability endorsement precludes coverage to an architect altogether. Aetna misreads the policy. The terms of formal exclusion from that coverage deny indemnity to an architect where the injury results from *defects in the designs or specifications prepared, acquired or used* by the architect. The duty of an insurer to defend an action depends upon whether the allegations of petition state a claim within the policy coverage. *Zipkin v. Freeman*, 436 S.W.2d 753, 754[1] (Mo. banc 1969). A comparison of the Morris third-party petition against Estrin with the terms of the architect exclusion from the contractual liability coverage endorsement shows, at once, that Count III of the Home Insurance Company petition against Morris [and made integral to the third-party petition against Estrin by reference] alleges more than a defect in design, but that injury resulted from a negligent failure of the architect to inspect the construction of the walls, among other causes. That activity falls within the indemnity of the General Conditions promised by Estrin to Morris for injury "from execution of the work provided for in [the] contract" and falls within the exclusion from indemnity

for the liability of an architect from defects in specifications.

■ The Count I *res ipsa loquitur* statement of claim against architect Morris and subcontractor Keystone, jointly, also— at least arguably—asserts a cause of action for negligent injury not excluded by the *defect in specification* term of the contractual liability coverage endorsement. To be sure, that Count prefaces the inference of negligence from the control and superior knowledge of the architect and subcontractor of the wall construction with allegations that the erection of that structure was according to the specifications and drawings. Those allegations construed most favorably to coverage, however, do not allege the plans as the source of injury, but rather as an indicium of the control and superior knowledge by the architect and subcontractor of the instrumentality of injury. If the proof allows—even only presumptively—a cause of action within the coverage, then the insurer must accept defense of the claim. 7C Appleman, Insurance Law and Practice § 4683, p. 42 (1979); Annotation, Liability Insurer—Duty to Defend, 50 A.L. R.2d 458, 504 (1956). Aetna was not excused from the defense of the Morris third-party petition against Estrin on the basis of the contractual liability coverage endorsement exclusion.[1]

The question remains whether Aetna, nevertheless, was excused from that defense by the policy term that excludes injury to property in the care or control of Estrin from the comprehensive liability coverage.

At the time of the casualty, the walls of the warehouse had taken form: the walls were topped out along most of the lengths and the steel framework was in place to that extent. The construction was concrete

---

1. Our discussion dispels, albeit not entirely, another Estrin contention: that the policy provision to exclude from the contractual liability coverage endorsement injury from defects in the plans of an architect was made altogether inoperative by the representation of the Aetna casualty underwriter—at the time of policy negotiation—that the coverage under the endorsement coextended with the Estrin contract obligation to indemnify the architect "from execution of work provided in [the] contract." Our decision that the control and custody exclusion of the comprehensive liability policy precludes coverage notwithstanding, renders moot whether the architect indemnity exclusion was fully or only partially operative against the Morris third-party petition and thus, against the Estrin claim.

blocks tied in by roof joints at places. It was Thanksgiving week. That Wednesday the work ceased from rainfall and it rained on Thursday, as well. The mud impaired work on Friday so that only a token crew was on the job site. From that Friday night until the next Monday morning Estrin had no regular employees on the job site, either as watchmen, supervisors or surveillers. Richard Estrin, vice-president of the general contractor firm, became concerned about the construction on that Sunday because gusts and high winds had felled a forty-foot elm tree by his home. He went to the job site at about three in the afternoon and found everything in order. The scaffolds loaded with ballast were in place and tied to the walls with wire to ensure stability according to standard construction procedure. The job superintendent for Estrin, Bryson, was also concerned about the wind, and went to the job site that Sunday. Fred Estrin, president of the contractor company, also went by the construction. On each occasion of inspection, everything was in order. On the next day, Monday, vice-president Estrin received a call from job superintendent Bryson that the wind had toppled a portion of the wall. The scaffolds were buried under the debris and some of the steel structure was bent.

The formal provisions of contract imposed duty on the general contractor to protect the work from damage and the property of the owner from injury. A separate provision imposed other duty on the general contractor to supervise the progress of the work and to "keep on his work . . . a competent supervisor and any necessary assistants." The Estrin officers understood their duty and authority under the contract to require the subcontractors to correct work imperfectly done or left in a dangerous condition. They also understood the contract duty to supervise all construction on the job site and then to protect that work. That authority included direction to a subcontractor—in this case, Keystone—to take further precaution to insure the safety of the walls.

On this evidence the court determined that Estrin was excluded from the Cover-age D of the comprehensive liability policy because the injury was to property *occupied* by Estrin and in the *control* of Estrin. The express premise of judgment was that the contract provisions were clear and unmistakable and that Aetna met by evidence the burden of an insurer to prove an exclusion from coverage.

Estrin contends that, evidence apart, the *care, custody or control* exclusions of the comprehensive liability policy are ambiguous and so are of no effect to deny coverage. The argument cites an array of cases, but they do not prove the contention. Informed commentary records a schism among judicial decisions as to whether or not the usual provision to exclude from the coverage of a liability policy damage to property in the *care, custody or control* of a contractor [or other insured] is inherently ambiguous. 12 Couch on Insurance 2d § 44:425 (1959); Long, Law of Liability Insurance §§ 10.16 and 16.06 (Matthew Bender 1980); Annotation, Liability Insurance—Custody of Insured, 62 A.L.R.2d 1242 (1958). Our decisions display—but only apparently—the same dichotomy. Estrin cites *Aetna Casualty & Surety Co. v. Haas*, 422 S.W.2d 316 (Mo.1968), *Kirchner v. Hartford Accident & Indemnity Co.*, 440 S.W.2d 751 (Mo.App.1969) and *Allison v. National Insurance Underwriters*, 487 S.W.2d 257 (Mo. App.1972) for the principle that such a policy term is inherently ambiguous. Aetna cites *Northwestern Mutual Insurance Co. v. Haglund*, 387 S.W.2d 230 (Mo.App.1965) and *Moore v. M.F.A. Mutual Insurance Company*, 422 S.W.2d 357 (Mo.App.1967) for the principle that the policy term was a clear exclusion from coverage. From that premise Estrin argues for judgment on the rule of construction which favors coverage against an exclusion uncertain and ostensible. Aetna argues, on the other hand, that as to a policy provision understandable as written, the correctness of judgment depends upon the evidence—in this case sustained by substantial proof that the walls at the time of casualty were in the *care, custody or control* of Estrin. Neither the cited cases on the policy clause nor the postures

of the litigants are in any true discord. Rather, they are all aspects of the basic rule of contract that where the language of agreement has a prevalent meaning the words are interpreted in light of all the circumstances to give effect to that ascertained purpose. Restatement (Second) of Contracts 2d, § 228 (Tentative Drafts Nos. 1–7, Revised and Edited 1973). That rule of contract operates, not to dispel an ambiguity, but to give effect to the reasonable expectations of the contractors, ambiguity or not.[2] 3 Corbin, Contracts, §§ 542–545, et seq. (1960).

An insurance policy is a contract of a distinctive species. It is the instrument whereby one contractor transfers a risk to another contractor [with the means to allocate the loss] who agrees to assume the risk for a consideration. 1 Couch on Insurance 2d §§ 1:1 through 1:4 (1959). It is also a contract of adhesion.[3] *Surface v.*

2. Section 228. Rules in Aid of Interpretation (1) Words and other conduct are interpreted in the light of all the circumstances, and if the principal purpose of the parties is ascertainable it is given great weight.

. . . . .

(3) Unless a different intention is manifested, (a) where language has a generally prevailing meaning, it is interpreted in accordance with that meaning;

. . . . .

Comment:
a. *Scope of special rules.* The rules in this Section are applicable to *all manifestations of intention and all transactions.* The rules are general in character, and serve merely as guides in the process of interpretation. *They do not depend upon any determination that there is an ambiguity,* but are used in determining what meanings are reasonably possible as well as in choosing among possible meanings. [emphasis in text added]

3. A contract of adhesion is a form contract submitted by one party and accepted by the other on the basis of *this or nothing.* It is an instrument devised by skilled legal talent for mass and standard-industrywide use which does not allow for idiosyncracy. It is a transaction not negotiated but to which one literally *adheres* from want of choice. Corbin on Contracts, §§ 534 and 559 (Kaufman Supp.1980); Keeton, *Insurance Law Rights at Variance With Policy Provisions*, 83 Harv.L.Rev. 961, 966 (1970); Hollman, *Insurance as a Contract of Adhesion*, Ins.L.J. p. 274 (May 1978). The adhesion contract is no longer an occasional incident of business. The standard form contract has become almost indispensible to commerce in a mass society [Corbin on Contracts § 559, p. 324 (Kaufman Supp.1980); Kaufman, *The Resurrection of Contract*, 17 Washburn L.J. 38, 40 (1977)]: loan contracts, mortgages, transportation tickets, credit card purchase slips [to name a few]—as well as insurance policies—are all contracts with imposed terms. 4 Williston on Contracts, Third Edition, Jaeger, §§ 621 through 626 (1963); 15 Williston on Contracts, Third Edition, Jaeger, 1763A (1972); *C & J Fertilizer, Inc. v. Allied Mutual Ins. Co.*, 227 N.W.2d 169, 173[6, 7] (Iowa banc 1975).

The standard form is not an inherently sinister phenomenon; it is the concomitant of a mass production society. Like manufactured goods, if contract services are to be provided at reasonable cost, they must be mass-produced and standardized. "Mass production and mass merchandising work to make all forms standard because a nonstandard [negotiated] form is characteristically just as expensive for a seller to make and sell as is a nonstandard tangible product. In either case he loses the ability to spread his costs of 'production'—legal or mechanical—over a large number of products . . . [T]he buyer of a nonstandard form would normally have to pay the expenses of his own attorney in negotiating it, in addition to the extra costs of the seller." Slawson, *Standard Form Contracts and Democratic Control of Lawmaking Power*, 84 Harv.L.Rev. 529, 531 (1971).

The transaction for the construction of the warehouse presents an archetype: The contracts for the enterprise are standard forms *all* devised by the American Institute of Architects and done in fine print except for a few insertions—such as the description of construction, the cost, the mode of payment and other such idiosyncratic provisions. They comprise "The Standard Form of Agreement Between Owner and Architect," "The Standard Form of Agreement Between Owner and Contractor," and "The General Conditions of the Contract for the Construction of Buildings." The agreement of the prime contractor [Estrin] to indemnify the architect [Morris] against liability for injury to person or damage to property from execution of the contract work was a term standard to *all* contract documents used in the industry—clearly contracts of adhesion. That imposed term did exclude indemnity for liability for architect errors or omissions—precisely the exclusion expressed in the contractual liability coverage endorsement issued by Aetna to Estrin. That limitation on indemnity was thereafter modified so that the standard construction industry form now imposes upon the contractor to provide an indemnity "to the fullest extent permitted by law." Coleman, *Insurance Requirements In Construction Contract General Conditions As An Element of Professional*

*Ranger Insurance Company*, supra, 47[2]; Corbin on Contracts, Part 1, § 534 (Kaufman Supp.1980); 7 Williston on Contracts, Third Edition, Jaeger, § 900 (1963). The basic purpose of contract law is to protect the reasonable expectations induced by agreements. 1 Corbin on Contracts § 1 (1960). Thus, whether assent to contract rests on negotiation or only adherence, the rules of construction subserve to give effect—as nearly as possible—to the expectations which induced agreement. *Linderer v. Royal Globe Ins. Co.*, supra, 661. In a negotiated contract, the words of agreement describe the terms of the bilateral assent and so—when stated unambiguously—are sufficient to disclose the reasonable expectations of the parties. *Craig v. Jo B. Gardner, Inc.*, 586 S.W.2d 316, 324[5, 6] (Mo. banc 1979). In a contract of adhesion, however, the terms are imposed by the proponent of the form: they are not expected to be read and even if read, the adherent has choice only to conform. 7 Williston on Contracts, Third Edition, Jaeger, § 906B (1963); 3 Corbin on Contracts § 559, pp. 265 et seq. (1960). The *assent* is resembled rather than actual. The printed words of contract alone, therefore, are not enough to disclose the expectations of the parties. The court must look for that purpose to the full circumstances of the transaction—whether the written words of contract be ambiguous or unambiguous. 3 Corbin on Contracts §§ 534 through 542 (1960); Restatement (Second) of Contracts 2d §§ 226 and 227 (Tentative Draft 1973). Our decisions understand that reality and give effect to the substance over the form of such an agreement.

The question on appeal as posed by Estrin—whether the *care, custody or control* exclusion of the comprehensive [and counterpart contractual] liability coverage is ambiguous or nonambiguous—misdirects inquiry. The consequence of ambiguity, the Estrin argument supposes, is to avoid altogether the effect of that exclusion. An insured has the burden to prove coverage under a policy. *Grossman Iron & Steel Co. v. Bituminous Casualty Corp.*, 558 S.W.2d 255, 259[2–4] (Mo.App.1977). The burden rests on the insurer to prove that the loss was within a policy exclusion. *Michigan Mutual Liability Co. v. Stallings*, 523 S.W.2d 539, 545[5] (Mo.App.1975). An ambiguity in a policy provision induces a construction most favorable to the insured—but does not foreclose evidence for interpretation. *Grossman Iron & Steel Co. v. Bituminous Casualty Corp.*, supra, l.c. 261[7, 8]. The principle that an ambiguous adhesion provision shall be given an intendment favorable to the adherent rests on the public policy that the inept drafter of a form had the resources to do better. Corbin on Contracts § 559 (Kaufman Supp.1980). The principle that an ambiguous adhesion provision shall be open to interpretation by evidence as well as by the written words rests on the role of the law to protect the reasonable expectations of the parties induced by the agreement. *Linderer v. Royal Globe Ins. Co.*, supra, l.c. 661; Restatement (Second) of Contracts 2d § 237, Comment e (Tent.Draft 1973);[4] Long, Law of Liability Insurance § 16.06 (Matthew Bender 1980).

*Negligence*, 23 St. Louis U.L.J. 264, 265 (1979). The adhesion provision of the General Conditions imposed upon Estrin by Morris became an integer of another adhesion provision imposed by Aetna upon Estrin.

Our decisions do not often use the *adhesion contract* terminology [but see, *Farm Bureau Mutual Insurance Company v. Broadie*, 558 S.W.2d 751, 755[4, 5] (Mo.App.1977); *Surface v. Ranger Insurance Company*, 526 S.W.2d 44, 47[2] (Mo.App.1975)] as the explicit basis for rationale. They use, rather, canons of contract construction to redress the imbalance of imposed terms by enforcement of the *reasonable expectations of the insured*—irrespective of ambiguity or nonambiguity or necessary stric-

ture of other technical rules which govern negotiated contracts. *Linderer v. Royal Globe Insurance Company*, 597 S.W.2d 656, 661 (Mo.App.1980); *Craig v. Iowa Kemper Mutual Ins. Co.*, 565 S.W.2d 716, 722 n.5 (Mo.App.1978); *Grossman Iron & Steel Co. v. Bituminous Casualty Corp.*, 558 S.W.2d 255, 261 (Mo.App.1977); *Bennett v. American Life and Accident Insurance Company*, 495 S.W.2d 753, 758[3, 4] (Mo. App.1973).

4. "[C]ourts in construing and applying a standardized contract seek to effectuate the reasonable expectations of the average member of the public who accepts it."

A standard contract, by the very nature, addresses the mass of users, and not the individual adherent. Thus, the reasonable expectations of the adherent are known, not from the words of the printed form alone, but from the total transaction. Therefore, not every ambiguity in an insurance policy is resolved favorably to the insured, but only where a reasonable person in the position of the adherent would have expected coverage. *Linderer v. Royal Globe Ins. Co.*, supra, l.c. 661; Keeton, *Insurance Law Rights at Variance With Policy Provisions*, 83 Harv.L.Rev. 961, 969 (1970); *Allen v. Metropolitan Life Ins. Co.*, 44 N.J. 294, 208 A.2d 638, 644[4] (1965). Accordingly, knowledge by Estrin at the time of issue that the *care, custody or control* provision was a term of exclusion from the policy coverage was an extrinsic proof open to Aetna to show that, ambiguity notwithstanding, Estrin had no reasonable expectation for coverage under the policy for the wind damage to the walls under construction. *Grossman Iron & Steel Co. v. Bituminous Casualty Corp.*, supra, l.c. 261[7, 8] (Mo.App.1977); Restatement (Second) of Contracts 2d § 228, Comment a (Tent.Draft 1973).[5]

The trial court found that the *care, custody or control* provision of the insurance policy was unambiguous and that the insurer Aetna met its burden to prove the exclusion. That the terms of the form policy were unambiguous, however, no more ends inquiry than to have found them ambiguous. In either case, the law protects the expectations of agreements, and in a form contract, those expectations do not reside altogether in the words—ambiguous or unambiguous—but in the total transaction. Corbin on Contracts § 559 (Kaufman Supp.1980); Restatement (Second) of Contracts 2d § 226, Reporter's Note (Tent. Draft 1973); *Linderer v. Royal Globe Insurance Co.*, supra, l.c. 661; *C & J Fertilizer, Inc. v. Allied Mutual Ins. Co.*, supra, l.c. 172[2]. The cases have dealt only infrequently with the *care, custody or control*

exclusion of a liability policy. Those cases which employ the ambiguous-nonambiguous dichotomy bring a disarray to the decisions and discourage a principled rationale. Annotation: Liability Insurance—Custody of Insured, 62 A.L.R.2d 1242 (1958); 12 Couch on Insurance 2d § 44:425 (1959). The construction given the exclusion in a case often reflects a result predisposed by the equity to relieve the harshness of a limitation to coverage imposed and not negotiated, but clearly stated, and so beyond the scope of extrinsic evidence under the traditional "strict meaning" canon of construction of negotiated contracts. See, Annotation: Liability Insurance—Custody of Insured, 62 A.L.R.2d 1242, especially §§ 3[a] and [b] (1958) and Later Case Service to the Annotation. In such a case, the court treats clear language as ambiguous to allow proof of the reasonable expectations of the adherent despite the constraint of the traditional rule. Kessler, *Contracts of Adhesion*, 43 Colum.L.Rev. 629, 633 (1943); Corbin on Contracts § 559A (Kaufman Supp.1980); Keeton, *Insurance Law Rights at Variance With Policy Provisions*, 83 Harv.L.Rev. 961, 962 (1970). One preeminent authority describes the usual mode of decision; "The [ambiguous-nonambiguous] distinction rarely dictates the result; rather it justifies it." Long, Law of Public Liability Insurance § 10:16 (Matthew Bender 1980). Also, *Elcar Mobile Homes, Inc. v. D. K. Baxter, Inc.*, 66 N.J.Super. 478, 169 A.2d 509, 516[1] (1961). With an increased incidence, contemporary decisions [our own among them] on insurance contracts in general and on the *care, custody or control* exclusion in particular have discarded the literal language [ambiguity-nonambiguity] test for the reasonable expectations of the adherent as the basis for judicial regulation of standard form insurance contracts.[6] These expectations are not dependent upon the literal language of contract altogether but are known from the total transaction. In the case of a *care, custody or control* exclusion, for instance, the clarity of language is sec-

---

**5.** See n.2.

**6.** See, n. 3 for a number of the Missouri citations.

ondary to the full circumstances—the actuarial considerations for the coverage, the purposefulness of the exclusion and the kind of property to which it was directed, the relationship of the insured to those in interest to the property, the special knowledge of the insured of a policy of that kind—among others. *Royal Indemnity Co. v. Smith*, 121 Ga.App. 272, 173 S.E.2d 738 (1970); *Elcar Mobile Homes, Inc. v. D. K. Baxter, Inc.*, 66 N.J.Super. 478, 169 A.2d 509 (1961); *Arrigo's Fleet Service, Inc. v. Aetna Life & Casualty Co.*, 54 Mich.App. 482, 221 N.W.2d 206 (1974). This merely conforms to the rule of contract, authoritatively held, that while a court reads the language to determine the legal effect, the expectations of contract—especially of an adherent to a standard form—depend upon the sense meant for the language as shown by the position of the parties at the time of contract. 3 Corbin on Contracts §§ 532–535 (1960) and § 559 (Kaufman Supp.1980); 4 Williston on Contracts, Third Edition Jaeger §§ 600–602 (1963); Restatement (Second) of Contracts 2d §§ 226–228 and §§ 237–238 (Tent. Draft 1973). The court construes the legal operation of the contract from the words but the finder of fact interprets the context of agreement for the sense the parties expected for the words. Restatement (Second) of Contracts 2d § 226 (Tent. Draft 1973). In this determination of reasonable expectations of contract ambiguity or nonambiguity is irrelevant to validate the use of extrinsic evidence. Restatement (Second) of Contracts 2d §§ 226–228 (Tent. Draft 1973); *C & J Fertilizer, Inc. v. Allied Mutual Ins. Co.*, 227 N.W.2d 169, 172[2–5] (Iowa banc 1975); *Eagle Insurance Company v. Albright*, 3 Wash.App. 256, 474 P.2d 920, 928 (1970); *Spectrum Enterprises, Inc. v. Helm Corp.*, 114 N.H. 773, 329 A.2d 144, 146[1–2] (1974).

To all effect, the method of review of our decisions have shown the same concern for substance over form to derive the reasonable expectations of an adherent to a standard form insurance policy. In a case where a *care, custody or control* exclusion in a liability policy was at issue [*Aetna Casualty & Surety Company v. Haas*, 422 S.W.2d 316 (Mo.1968)], our Supreme Court found the term nonambiguous as written "so that extrinsic evidence may not be resorted to to resolve the uncertainty," but nevertheless found a "latent" ambiguity[7] as "to what the exclusions [were] applicable" [l. c. 319], so as to allow evidence of the understanding of the adherent insured as to the sense of the exclusion term in order "to give the insured the protection which he reasonably had a right to expect." [l. c. 321] The court overcame the constraint against extrinsic evidence to prove unambiguous language under the "strict meaning" canon of construction of negotiated contracts, in order to protect the reasonable expectation of the insured for coverage. The evidence of the full transaction in *Haas* showed that the practical construction given by both the insured and insurer under an earlier policy with identical terms resulted in the payment of a similar loss, so that the expectation for coverage was valid under the subsequent policy. The court gave the exclusion no effect because the expectation of the adherent for the nonapplication of the exclusion as to that property was reasonable. A case from this court [*Kirchner v. Hartford Accident & Indemnity Co.*, 440 S.W.2d 751 (Mo.App.1969)] holds that—ambiguity or nonambiguity apart—the purpose of the coverage as shown by all the evidence bears on whether the *care, custody or control* exclusion shall be given effect. *Kirchner* [l. c. 758] determined that the exclusion would defeat a coverage reasonably

---

7. The "latent" ambiguity device is a regular judicial method to allow evidence of the total transaction of an adhesion agreement despite contract language otherwise clear. The obvious effect is to avoid the stricture against extrinsic evidence so that an adherent may be allowed to prove a reasonable expectation for coverage despite the apparent sense of the imposed term on the printed form. See, e. g., *Boone County v. Blue Cross Hospital Service, Inc. of Missouri*, 526 S.W.2d 853 (Mo.App. 1975); *Prestigiacamo v. American Equitable Assurance Co. of New York*, 240 Mo.App. 839, 221 S.W.2d 217 (1949); *Sims v. Missouri State Life Ins. Co.*, 223 Mo.App. 1150, 23 S.W.2d 1075 (1930), and other cases in Missouri Digest, Evidence, Key 452, Latent Ambiguity.

expected under the comprehensive policy "to protect [the insured] from claims arising out of the performance of his work and services," and so found coverage.[8]

Contract derives its authority from the willingness of the law to give enforcement. The law will give enforcement where the contract is a legitimate statement of rights and duties. In a system of free government, legitimacy derives from transactions done by free assent. In a system of free enterprise, legitimacy derives from free negotiation between equals brought together by market conditions. Kessler, *Contracts of Adhesion—Some Thoughts About Freedom of Contract*, 43 Colum.L.Rev. 629, 630 (1943); Slawson, *Standard Form Contracts and Democratic Control of Lawmaking Power*, 84 Harv.L.Rev. 529, 533 et seq. (1971). The law will protect therefore a contract the result of assent between equals. The contract where the parties choose all the terms of agreement, however, is no longer typical. The proliferation of business transactions from the mass produc-

tion and distribution of goods made too costly—and otherwise impossible—a separate contract *distinctive* for each separate *transaction*, and made inevitable a form contract for a *typical transaction*. Once formulated by the business enterprise, the form is used in every bargain involved with that product or service. Kessler, *Contracts of Adhesion—Some Thoughts About Freedom of Contract*, 43 Colum.L.Rev. 629, 631 (1943). These terms are not the result of formal assent but are imposed. The other party does not agree to the transaction, but only adheres from want of genuine choice.[9]

The legitimacy of an adhesion contract derives, not from the social value of a transaction freely negotiated, but from the social value of goods produced more abundantly and cheaper from the reduced cost of legal and other distribution services. Kaufman, *The Resurrection of Contract*, 17 Washburn L.Rev. 38, 48 (1977); Slawson, *Standard Form Contracts and Democratic Control of Lawmaking Power*, 84 Harv.L.Rev. 529, 554

---

**8.** Estrin contends, as we note, that the *care, custody or control*-exclusion of the Aetna comprehensive policy is ambiguous and so should be resolved in favor of coverage. We have determined that the question misdirects inquiry—that *all* contemporary authority, as well as explicit and implicit rationales of Missouri decisions, look to whether the written words of the insurance policy provision [ambiguous or nonambiguous] meet the reasonable expectations of the adherent insured as determined by the full evidence of the meaning understood for the words and the objective of the transaction. On the very grounds of the Estrin argument as made, however, *no* Missouri case holds such an exclusion clause inherently ambiguous—as Estrin contends for the insurance language. Estrin mentions *Haas* and *Kirchner* for that proposition. Neither supports contention. The other case cited, *Allison v. National Insurance Underwriters*, 487 S.W.2d 257 (Mo.App.1972), holds only that to give the *care, custody or control* exclusion effect *within the terms of that policy* would be to nullify the coverage altogether because of an internal contradiction in terms, and not because the exclusion phrase was inherently ambiguous. Our decisions, rather, consistently find the term [in the conventional contract parlance] *unambiguous*. *Moore v. M. F. A. Mutual Insurance Co.*, 422 S.W.2d 357 (Mo.App.1967); *Northwestern Mutual Insurance Company v. Haglund*, 387 S.W.2d 230 (Mo.App.1965); and *Haas*, supra.

**9.** The advent and domination of the adhesion contract as the distinctive instrument of national and international commerce has prompted astute analysis of the role of contract as a social medium in a free society. Contract is seen as the single most potent and pervasive exercise of private legislation. That is because "[i]f a contract will be enforced by the courts, it is as much a 'law' between the parties as if it had been passed by the legislature." Kaufman, *The Resurrection of Contract*, 17 Washburn L.Rev. 38, 50 (1977). The right to contract, then, is seen as a delegation to the individual by the sovereignty of the lawmaking power. Kessler, *Contracts of Adhesion—Some Thoughts About Freedom of Contract*, 43 Colum.L.Rev. 629, 641 (1943); Oldfather, *Toward A Usable Method of Judicial Review of the Adhesion Contractor's Lawmaking*, 16 Kansas L.Rev. 303 (1968). On that analogy, the concern arises whether the private lawmaking power by the imposed [and so authoritarian] *mass nonassented contract* can be made to conform to the values of the *negotiated assented* [and so democratic] *contract*. This is accomplished in each case by the protection of the reasonable expectations of the transaction both where the written words alone are and are not the final statement of agreement. Slawson, *Standard Form Contracts and Democratic Control of Lawmaking Power*, 84 Harv.L.Rev. 529, 542–544 (1971).

(1977); Kessler, *Contracts of Adhesion—Some Thoughts About Freedom of Contract*, 43 Colum.L.Rev. 629, 632 (1943). The usefulness of contract as a business form, particularly in mass transactions, depends upon a predictable adherence. That becomes possible only because the reasonable expectations of promises receive the protection of the law. Lawson, *Fault and Contract—A Few Comparisons*, 49 Tulane L.Rev. 295, 309 (1975); 1 Corbin on Contracts § 1 (1963). In the case where the contract results from free negotiations between persons brought together by market conditions, the reasonable expectations of agreement are shown by the words. In such a case, the court simply enforces the words of contract. In the case of a contract devised by the enterpriser for the mass market, and not for any particular person, the terms are predetermined and imposed. The validity of the transaction rests not on individual assent, but on mass consensus. The reasonable expectations of an adherent, therefore, do not derive from the words of the form alone, but from the words to the extent they reflect the typical transaction.

 The principle of reasonable expectations as it applies to an adherent of a form contract, therefore, has validity because it removes the fiction of a negotiated assent and places the adherent in "the typical life situation" to determine the purpose of the contract. Kessler, *Contracts of Adhesion—Some Thoughts About Freedom of Contract*, 43 Colum.L.Rev. 629, 637 (1943). It takes into account that "[o]ne of the purposes of standardization is to eliminate bargaining over details of individual transactions" so that the adherent merely "assents to a few terms, typically inserted in blanks on the printed form, and *gives blanket assent to the type of transaction* embodied in the standard form." Restatement (Second) of Contracts 2d § 237, Comments b and c (Tentative Draft 1973, emphasis added). Thus, in construction of a standard form contract, a court will allow evidence of the *total transaction* to give effect to the "generally prevailing meaning" of the language. Restatement (Second) of Contracts 2d §§ 226–228, § 238 (Tent. Draft 1973). In this process of construction of a standard contract, courts "seek to effectuate the reasonable expectations of the average member of the public who accepts it." And "[a]lthough customers typically adhere to standardized agreements and are bound by them without even appearing to know the standard terms in detail, they are not bound to unknown terms which are beyond the range of reasonable expectation." Restatement (Second) of Contracts 2d § 237, Comments e and f (Tent. Draft 1973).

The rationale of a typical transaction as the basis for the reasonable expectations of an adherent rests on the premises, therefore, that [Slawson, *Form Contracts and Democratic Control of Lawmaking Power*, 84 Harv.L.Rev. 529, 538 and 544 (1971)]:

> [t]he *whole* form is rarely that manifestation [of consent], because it usually contains terms as to which the recipient was wholly or partially ignorant. But the consent of the recipient in such a situation does serve to legitimate those parts of the form, if any, which do manifest it, and it constitutes the principal authoritative standard to which the other parts of the form must be shown to conform. [p. 538, original emphasis]

> . . . . .

> *Reasonable expectations are determined not by what the form recites but by the actual context in which the transaction is conducted. When that context is such as to preclude the reasonable expectation that the printing will be read or understood in any significant number of cases, the seller cannot claim that he nonetheless so expected.* [p. 544, emphasis added]

See, also, 3 Corbin on Contracts § 559 (1960) and (Kaufman Supp.1980); Llewellyn, Common Law Tradition—Deciding Appeals, pp. 362 et seq.; *C & J Fertilizer, Inc. v. Allied Mutual Ins. Co.*, 227 N.W.2d 169, 175[9] (Iowa banc 1975).

The liability insurance policy presents a familiar contract of adhesion. One authority describes the archtypical transaction

[Slawson, *Standard Form Contracts and Democratic Control of Lawmaking Power*, 84 Harv.L.Rev. 529 (1971)]:

> Purchasers of insurance, for example, normally agree only on the price, the term, the monetary limits of coverage, and, in a very rough sense, the risks to be covered. All the other provisions are left for the insurer to set unilaterally in the form of a policy. [l. c. 533]

> . . . . .

> [Insurance policies are] [s]tandard forms which a recipient could not reasonably be expected to read or understand are regularly treated as contracts. Insurance policies provide probably the extreme illustration. Purchasers of insurance usually do not even receive their policies until after the purchase and probably not one insured in a hundred reads his policy in an understanding manner even then. [l. c. 540]

> . . . . .

Since the recipient is ignorant of its terms or even its existence until after he has consummated the transaction, it cannot possibly be the manifestation of his consent . . . . [l. c. 541]

. . . . .

That analysis derives the formulation by a preeminent authority specifically for an insurance policy of adhesion [Keeton, *Insurance Law Rights at Variance With Policy Provisions*, 83 Harv.L.Rev. 961, 967 (1970)]:

> The objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations.

That statement of principle was approved and adopted in *Linderer v. Royal Globe Insurance Co.*, 597 S.W.2d 656, 661 (Mo.App. 1980).[10]

> Whether a product is tangible or intangible, its creator ordinarily has reason to know of the purposes for which the buyer intends to use it, and buyers ordinarily rely on the creator's skill or judgment in furnishing it. The reasonable consumer for example depends on an insurance agent and insurance company to sell him a policy that "works" for its intended purpose in much the same way that he depends on a television salesman and television manufacturer. In neither case is he likely to be competent to judge the fitness of the product himself; in both, he must rely on common knowledge and the creator's advertising and promotion.
>
> A standard form thus normally comes subject to implied warranties of fitness for intended purpose. This warranty serves the function of the underlying contract, implied from the conduct of both parties, to which the standard form must conform if it is to be valid.

On either analysis, the transaction is treated as it is in reality—a sale of promises rather than a negotiated contract—and in both cases the adherent-consumer is induced by reasonable expectations. Uniform Commercial Code § 400.-2–204, RSMo 1978. Fischer, *Products Liability—The Meaning of Defect*, 39 Mo.L.Rev. 339, 342, 349 (1974). The breach of that expectation as to the sale is actionable as a failure of the implied warranty. The breach of that expectation as to the contract is actionable by refusal of the court to accord the provision effect. Corbin on Contracts §§ 559A–559E (Kaufman Supp.1980).

10. Another, and equally valid, analysis treats an adhesion contract, especially an insurance policy, as a purchase of services—rather in the nature of a special chattel rather than a contract—and so protected by an implied warranty of fitness for the intended purpose under Uniform Commercial Code § 400.2–314, RSMo 1978. 7 Williston on Contracts, Third Edition, Jaeger, § 900, p. 34 (1963); Corbin on Contracts § 559, p. 319 (Kaufman Supp.1980); *C & J Fertilizer, Inc. v. Allied Mutual Ins. Co.*, 227 N.W.2d 169, 178 (Iowa banc 1975). The kinship in principle and in practical contemplation of the usual adherent-consumer between the sale of goods and the purchase of an insurance policy is drawn with acuity by Slawson, *Standard Form Contracts and Democratic Control of Lawmaking Power*, 84 Harv.L.Rev. 529, 546–7 (1971):

> The law of sales provides that a seller of (tangible) goods makes an "implied warranty of fitness for intended purpose" on any goods he sells if he knows, or has reason to know, the particular purposes for which the buyer intends to use them and that the buyer is relying on his skill or judgment in furnishing or selecting them. Under modern sales practices, the warranty usually reaches from the consumer back to the manufacturing seller and sometimes, though less frequently, to the immediate, or retail, seller as well.
>
> Although implied warranties of fitness for intended purpose have traditionally been attached only to sales of tangible products, there is no reason why they should not be attached to "sales of promises" as well.

The question, then, is not whether the *care, custody or control* exclusion of the comprehensive liability insurance policy is ambiguous or nonambiguous, but whether that provision was a term within the reasonable expectation of the insured general contractor Estrin for coverage. The trial court found on the evidence that as a matter of fact the walls of the warehouse construction were in the *care, custody or control* of Estrin at the time of the damage and so excluded from the policy effect. If that determination rests on substantial evidence, then Estrin has no cause of action [*Murphy v. Carron*, 536 S.W.2d 30, 32[1–3] (Mo. banc 1976)], unless the policy exclusion was contrary to the Estrin reasonable expectations for coverage and so not entitled to effect.

There was evidence by Estrin, vice-president of the construction company. He was the officer of the corporation in charge of the insurance requirements for the business operations. He had purchased coverages for the Estrin operations from Aetna over a number of years. In that course, he consulted the Aetna agent or casualty underwriter for explanations of coverages. The 1966 comprehensive liability insurance policy in contention was the same form that had issued for the past six years. The testimony on the policy terms, both by vice-president Estrin and Aetna underwriter Woolf, related to the Estrin expectation for coverage under the contractual liability endorsement for defense of the Morris third-party petition [a contention we have already determined favorably to Estrin] and not to the *care, custody or control* exclusion of the comprehensive [and contractual] liability policy.

There was a concurrence of testimony between vice-president Estrin and Aetna underwriter Woolf that various standard insurance policy coverages were available for specific operations of a general contractor. Estrin dealt with the coverages as the administrative officer of the corporation. The comprehensive liability policy insured the contractor operations against liability to the public. That coverage ran for the policy at a predictable premium year and was purchased from Aetna during the time of the warehouse construction. The builders risk policy was to give extended coverage to the contractor for loss against wind, hail, natural disaster and the like. That coverage was by a specific policy for the particular job and carried its own premium. That coverage was purchased from the Home company and paid for the full loss to the walls from the windstorm. The comprehensive liability policy was likened to the effect of an automobile liability coverage, and the builders risk policy to the collision coverage.[11] Yet another coverage, the broad form property damage endorsement, insured against a liability loss to property within the *care, custody or control* of a contractor insured. That was available at additional premium cost.

The evidence shows Estrin was better informed about insurance coverages than the usual layman, but not that he was better informed about the coverages on construction operations than the usual general contractor. The evidence shows that a general contractor knows what special requirements a job will entail—hence the builders risk policy—and so protect against contingencies by endorsements or other insurance devices. There is no suggestion that the *care, custody or control* exclusion—or, for that matter, the indemnity exclusion for liability from defective plans and designs of the architect—was a surprise to Estrin. These endorsements, however, are no more negotiated promises than are the policies. They come in standard form and require adherence. Knowledge that coverage and

11. That analogy recurs in the decisions to delineate that under a comprehensive liability policy an insured has reasonable expectation against the liability of the contractor for damage to third persons and not to the insured itself. Thus, the function of the *care, custody or control* exclusion is to prevent the liability policy from coverage for loss to the insured's own property by the insured's own act without additional premium cost. See, for instance, *Northwestern Mutual Insurance Co. v. Haglund*, 387 S.W.2d 230, 233 (Mo.App.1965) and *Moore v. M.F.A. Mutual Insurance Co.*, 422 S.W.2d 357, 358[2] (Mo.App.1967).

exclusion provisions exist in an insurance policy, therefore, does not preclude a reasonable expectation that the exclusion does not nullify the dominant purpose of the transaction. The rationale rests on the nature of an adhesion contract, and in particular, of an insurance policy of adhesion: the written terms address the mass of people, not the individual adherent, and so rests for validity on the reasonable expectations, not of the adherent, but of the mass of adherents.

■■■ The law, therefore, protects expectations *objectively* reasonable, as consonant with the purpose of the standard contract—to avoid bargains over details of an individual transaction to achieve lower cost possible only by mass transaction. Restatement (Second) of Contracts 2d § 237(2) (Tent.Draft 1973) states the principle:

[A standardized agreement] is interpreted wherever reasonable as treating alike all those similarly situated, without regard to their knowledge or understanding of the standard terms of the writing.

In the special instance of the standard insurance contract, Keeton, *Insurance Law Rights at Variance With Policy Provisions*, 83 Harv.L.Rev. 961, 974 (1970) states the principle upon which the law protects the reasonable expectations of the transaction for coverage despite a policy exception:

If the enforcement of a policy provision would defeat the reasonable expectations of the great majority of policyholders to whose claims it is relevant, it will not be enforced even against those who know of its restrictive terms.

Thus, ambiguity of language, general knowledge of content, and even that the policyholder may have read the language, all bear on the assessment as to the objective reasonableness of the expectation of coverage by a person in that position. That is to vindicate the public policy for fair treatment for the individual compelled by the economics of mass transactions to conduct affairs on terms dictated by an industry rather than on terms freely negotiated. Corbin on Contracts § 559H (Kaufman Supp.1980); Kaufman, *The Resurrection of*

*Contract*, 17 Washburn L.Rev. 38, 50 (1977). Thus, a term of a non-negotiated insurance policy, or other standard contract, which does not meet reasonable expectations of the great majority of adherents is unfair and so subject to the judicial power to correct. 3 Corbin on Contracts, §§ 323, 324 (1960) and 559A–G (Kaufman Supp.1980); Uniform Commercial Code § 400.2–302, RSMo 1978; *Funding Systems Leasing Corporation v. King Louie International, Inc.*, 597 S.W.2d 624, 634[6], 648 (Mo.App. banc 1979).

■■■ The basis to determine unfairness is given [Restatement (Second) of Contracts 2d § 237, Comment f, *Terms excluded*]:

[A] party who adheres to the other party's standard terms does not assent to a term *if the other party has reason to believe that the adhering party would not have accepted the agreement if he had known that the agreement contained the particular term.* Such a belief or assumption may be shown by the prior negotiations or inferred from the fact that the term is bizarre or oppressive, from the fact *that it eviscerates the nonstandard terms explicitly agreed to, or from the fact that it eliminates the dominant purpose of the transaction.* [emphasis added]

See, also, Keeton, *Insurance Law Rights at Variance With Policy Provisions*, 83 Harv.L. Rev. 961, 968 (1970); Corbin on Contracts § 559G (Kaufman Supp.1980). The evidence implies clearly that term, price and limit of the comprehensive liability coverage were elements of the transaction with Aetna given explicit assent by Estrin but that the risks covered—both as to the comprehensive and contractual [architect indemnity] liability—were accorded no more than that general assent usual to form provisions. There is no issue that Estrin was not aware of the *care, custody or control* restriction to the coverages nor [we assume from the vice-president Estrin familiarity with insurance costs] that a policy without the exception, that is for fuller coverage, commanded more premium. Thus, the exception cannot be deemed unfair because it

"eviscerates the nonstandard terms explicitly agreed to ...." Restatement (Second) of Contracts 2d § 237, Comment f. There remains question whether the *care, custody or control* exception is unfair because [it eliminates the dominant purpose of the transaction." Restatement (Second) of Contracts 2d, supra.

A liability insurance policy protects the insured from liability for damage to the property or person *of another.* Vance on Insurance, § 196 (Hornbook Series 1951). A contractor's comprehensive liability insurance protects a contractor from liability for damage to the property or person *of another.* Mustachio, *Manufacturers' and Contractors' Liability Insurance Policy: The Care, Custody, or Control Exclusion Clause,* 6 Houston L.Rev. 359, 360 (1968). The reasonable expectation of the vast number of liability policy adherents, whether to the usual automobile liability policy or to a contractor's comprehensive liability policy, conforms to the understanding that the property and person of the insured is not protected against tortious acts of the insured under the usual terms of such an insurance contract. They understand, for instance, that a liability coverage of an automobile relates to damage done to others through fault and that collision coverage relates to damage done to owned property even without fault. *Moore v. M.F.A. Mutual Insurance Co.,* 422 S.W.2d 357, 358[2] (Mo.App. 1967); *Northwestern Mutual Insurance Co. v. Haglund,* 387 S.W.2d 230, 233 (Mo.App. 1965). So must the vast number of contractors understand that the comprehensive liability coverage on a construction operation protects the insured against loss *to others* from errors of the contractor; just as they understand that a builders risk coverage protects the contractor insured against loss even without contractor error. Mustachio, *Manufacturers' and Contractors' Liability Insurance Policy: The Care, Custody, or Control Exclusion Clause,* 6 Houston L.Rev. 359 (1968).

To sustain the Estrin contention that the *care, custody or control* exclusion be of no effect amounts to a determination that a reasonable expectation from a contractor's comprehensive liability policy is that the property of the contractor will be protected against injury from conduct of that contractor. That can only be valid if the exception *eliminates the dominant purpose of the transaction.* Restatement (Second) of Contracts 2d § 237, Comment f (Tent. Draft 1973). The dominant purpose of such a standard liability insurance policy, however, is to insure against liability to *others,* not to oneself. The exception, therefore, subserves the dominant purpose of the transaction, rather than avoids that purpose and so meets that test of fairness. Corbin on Contracts § 559G (Kaufman Supp.1980).[12] The *care, custody or control* exception to the comprehensive liability policy, therefore, was a fair basis for Aetna to predict the risk of loss from construction projects, formulate the standard exclusion as consistent with the reasonable expectations of the contractor policyholder for coverage from liability to *others,* and calculate a premium at a more reasonable rate on the basis of mass adherence. Corbin on Contracts § 559 (Kaufman Supp.1980); Slawson, *Standard Form Contracts and Democratic Control of Lawmaking Power,* 84 Harv.L.Rev. 529, 552 (1971); Mustachio, *Manufacturers' and Contractors' Liability Insurance Policy: The Care, Custody, or Control Exclusion Clause,* 6 Houston L.Rev. 359 (1968).

There remains only the determination whether the walls under construction were, as a matter of proven fact, *property in the care, custody or control of the insured or property as to which the insured for any purpose is exercising physical control* within exclusion (j)(3) of the comprehensive liability policy and exclusion (h)(2) of the contrac-

12. Considered in terms of the reasonable expectations rationale of adhesion—particularly insurance—contracts, the basis for decision in *Allison v. National Insurance Underwriters,* 487 S.W.2d 257 (Mo.App.1972)—cited by Estrin as authority for the contention that a *care, custody or control* exception in a liability policy is inherently ambiguous—was, rather, that the exception eviscerated the dominant purpose for the coverage and therefore was unfair as contrary to the reasonable expectations of that transaction.

tual liability coverage endorsement. No doubt, *control* within the sense of the exclusion means *physical control*, either by the insured or another on behalf of the insured. The requisite *control*, therefore, is possessory rather than proprietary. No doubt also, that to give effect to the exception, *physical control* must be at the time the loss to the property accrues. *Kirchner v. Hartford Accident & Indemnity Co.*, 440 S.W.2d 751, 755 et seq. [1, 2] (Mo.App.1979); Annotation: Liability Insurance—Custody of Insured, 62 A.L.R.2d 1242 § 4 (1958). *Kirchner* was a case where the steel frame of a structure erected by a subcontractor collapsed from a windstorm on a weekend at a time when the work project was unattended. The court held that the steel framework structure was not in the physical control of the subcontractor at the time of casualty and so was not excluded from the comprehensive liability coverage. Estrin cites the resemblance of the *Kirchner* facts to the circumstances of the Estrin construction as inexorable proof that at the time of that wall collapse Estrin had no custody or control of that property. *Kirchner*, however, rests on the rationale [l. c. 757] that as a matter of law [policy construction]

> [t]he exclusion clause in question contemplates those situations where the insured exercises *some* sort of *control* over the property damaged

and that as a matter of proven fact

> [i]n this case, we do not reach the question of the extent of control necessary for its application, for the insured had *no custody or control* of the property at the time of the loss under any view of the matter. [emphasis added]

The essential distinction between *Kirchner* and Estrin resides in the nature of the relationship between each builder and the property lost to damage. The insured in *Kirchner* was a subcontractor whose only function was to erect the steel framework for the structure. He had nothing to do with any other aspect of construction, and consulted with general contractor Brown for approval of the subcontract work as it was done. The effect of the evidence was

that the subcontractor employees had no role on the job site after work hours, and none of them was present at the time of the structure collapse. On the Friday of the weekend of the casualty, they braced the steel structure—only partially completed—and after inspection and approval by Brown, who could have required additional protection, the subcontractor left the site. The total project was subject to the supervision and approval of general contractor Brown.

The insured Estrin, on the other hand, was a general contractor [and so in the position of Brown rather than Kirchner]. The obligation to perform, unlike that of *Kirchner*, was delineated in construction contract documents. Those terms imposed the duty on Estrin as general contractor to supervise the job and protect the property during the construction. The contract rested the option on the general contractor [as vice-president Estrin acknowledged] to post a watchman at the site after hours, if so disposed, and in fact after the walls toppled, a watchman was used. On the event of the windstorm, however, none was in place. The supervision over the entire project was brought to bear from Estrin on the subcontractors through Estrin job superintendent Bryson. In this manner, Bryson had the authority to order a subcontractor to correct work improperly performed or left in a dangerous condition. On the Friday before the fall of the walls, Bryson examined the scaffold which ballasted the walls and was satisfied the work was sufficiently protected. He had authority over the wall subcontractor to require further precautions for the safety of that construction. Then, during the weekend, Bryson and the Estrins inspected the work site from time to time. In short, the duty of Estrin as prime contractor was to produce a structure built according to specifications of the contract and to protect that property in the process.

The difference between the circumstances in *Kirchner* and *Estrin*, therefore, is that *Kirchner had no control* over the construction property as an adjudicated fact

[1.c.757] whereas *Estrin had control* over the construction property as an adjudicated fact.[13]

█ The policy exclusion operates only, however, when the insured has *care, custody or control* of the property at the time the damage occurred. Physical control involves an exercise of dominion over the property. The possibility of physical control depends upon the nature of the property, whether a chattel or real estate. In each case the characteristic of the property determines the nature of the dominion and control possible. *Boswell v. Travelers Indemnity Company,* 38 N.J.Super. 599, 120 A.2d 250, 255[15] (1956). In the case of a chattel, control is easily found—a bailment is enough. *Royal Indemnity Company v. Smith,* 121 Ga.App. 272, 173 S.E.2d 738, 739 (1970); *Northwestern Mutual Insurance Company v. Haglund,* 387 S.W.2d 230 (Mo. App.1965). In such a case, the control is over the *whole* property. A reasonable—although not invariable—analogy applies to real estate. Thus, courts do not readily find real property in the *care, custody or control* of a repairman or subcontractor engaged to work on less than the whole of the structure. *Kirchner,* supra; *Gibson v. Glens Falls Insurance Company,* 128 S.E.2d 157 (S.C.1962).

The general contractor usually performs under a written contract which defines the party to control the property at any given stage of the work—usually the general contractor, itself. That allocation of control, as in the case of Estrin, also impinges on the obligation to insure and determines the cost of the premium. The terms of a written contract which delineates the control of an insured over the construction, therefore, bear on the determination of *care, custody or control* by the contractor over the real property at any given stage of work. *Pickard Trucking Co. v. General Accident Fire & Life Assurance Corp.,* 169 N.E.2d 499 (Ohio App.1960); *L.L. Jarrell Construction Company, Inc. v: Columbia Casualty Company,* 130 F.Supp. 436 (S.D.Ala.1955); *A.T.*

*Morris & Co. v. Lumber Mutual Casualty Ins. Co.,* 163 Misc. 715, 298 N.Y.S. 227 (1937); Mustachio, *Manufacturers' and Contractors' Liability Insurance Policy: The Care, Custody, or Control Exclusion Clause,* 6 Houston L.Rev. 359, 364 (1968).

█ The terms of the contract documents vested the responsibility for the project on general contractor Estrin. The immediate supervision of every phase throughout was on Estrin and had not terminated at the time the walls collapsed. The duty under the contract did not lapse at nightfall, rather Estrin had the duty to see the work secured and to protect it further by a watchman during that time. Estrin understood that duty and performed it on other occasions. That a watchman or other Estrin personnel was not at the site at the time of the damage does not lessen the responsibility to control the property or the actual control Estrin exercised throughout the project, even during the idle days before the damage occurred. This right of control was paramount to any dominion the subcontractors, architects or other personnel on the job could assert under the contract or otherwise. It was tantamount to a right of possession until the construction was completed. There was substantial evidence to support the determination of the trial court that at the time the walls toppled they were in the *care, custody or control* of the general contractor Estrin so that the damage to that property was excluded from coverage under the liability policy from Aetna to Estrin.

The judgment is affirmed.

All concur.

█

---

**13.** The trial court expressly found as a predicate to judgment that at the time of collapse

"the property was in Estrin's care, custody and control and was in Estrin's physical control."