John SPYCHALSKI, Appellant,

v.

MFA LIFE INSURANCE COMPANY, Respondent.

No. WD 31901.

Missouri Court of Appeals, Western District.

June 30, 1981.

Thomas A. Sweeny, John E. Turner, Popham, Conway, Sweeny, Fremont & Bundschu, P.C., Kansas City, for respondent.

Before KENNEDY, P.J., and SHANGLER and SOMERVILLE, JJ.

SHANGLER, Judge.

The plaintiff John Spychalski brought a petition in two counts against the defendant MFA Life Insurance Company on the theory that two policies of insurance issued by MFA, by the intention of contract, constituted wife Diane Spychalski *the insured* and himself *the beneficiary*. The face of each policy designated the plaintiff John Spychalski as *Insured*. The plaintiff contends that the policy designation notwithstanding, the application and other evidences of the contract transaction disclose the true intention that the policies should issue with the husband and wife each as an insured and each as the beneficiary of the other. The plaintiff presented evidence and at the conclusion of that proof the court sustained a "motion for directed verdict"—[more correctly, a motion for judgment, in a trial to the bench] on the ground that:

> [t]he court can find no agreement by the defendant to insure the life of plaintiff's spouse . . . While ambiguities are to be construed against the company, to provide coverage in this case would accomplish a rewriting of the policy.

The plaintiff John Spychalski appeals.

The two policies in contention issued separately under separate designations.

Policy L–71342 issued on January 17, 1973, in the face amount of $10,000 for an annual premium of $238. The "Policy Applied For" entry on the application [item 17] shows: "Golden Family—Face Amount $10,000." The cover sheet on the policy describes the coverage: "MFA Golden Family Policy." The "Beneficiary" entry on the application [item 24] designates wife Diane the primary beneficiary and children Scott and Cynthia the contingent beneficiaries. A formal term of that policy renders the

William M. Austin, Kansas City, for appellant.

Insured beneficiary of 40% of the face amount upon proof of the death of the spouse of the Insured. Another formal term—Accidental Death Benefit Provision—benefits the beneficiary for the accidental death of the Insured in an amount equal to the face of the policy.

Policy L–91470 issued on June 13, 1974, in the face amount of $65,000 for an annual premium of $1,269. The "Policy Applied For" entry on the application [item 17] shows: "Whole Life—Face Amount $65,-000." The cover on the policy describes the coverage: "Whole Life Policy." The "Beneficiary" entry on the application [item 24] designates wife Diane the primary beneficiary and children Scott and Cynthia the contingent beneficiaries. A formal term of that policy renders the beneficiary entitled to the face amount of the policy upon death of the Insured. Another formal term—Accidental Death Benefit—pays the beneficiary for the accidental death of the Insured before age 70 in an amount equal to the face of the policy—for the recited additional annual premium of $54.60.

The wife Diane committed suicide on September 6, 1977, under conditions—according to petition allegation—which constituted an *accidental death* within the sense of the two policies and of the law of Missouri. On that date each policy provid-

ed for payment to the beneficiary of an indemnity equal to the face amount of the policy upon the accidental death of the Insured. Thus, the accidental death coverage under Policy L–71342 was $20,000 and the accidental death coverage under Policy L–91470 was $130,000. The husband Spychalski gave timely notice and proof of death to the insurer MFA. The insurer paid to the husband the sum of $4,000 under the Policy L–71342 agreement to pay to the "appropriate beneficiary, as defined in the policy":

"[B] 40% of the Face Amount upon receipt of due proof of the death of the Insured's spouse.... [1]

The husband contends that each policy covered not only his life but also the life of wife Diane, and so claims as her beneficiary under each policy. Thus, the husband contends for the accidental death indemnity payable under each policy as well as the face amount.[2] The husband seeks additional sums as penalty and attorney fee for vexatious refusal to pay under the statute [§ 375.420]. The insurer MFA contends, simply, that husband John *alone* by clear designation was an *Insured* under each policy and that the $4,000 benefit paid him under the distinctive Golden Family Policy was all the entitlement due.

1. Policy L–71342 was designated MFA Golden Family Policy. The provision of the policy under which the insurer paid the husband $4,000 is paragraph [B] of the cover page of the policy.

2. The petition pleads two causes of action: Count I alleges that Policy L–91470 insured the life of Diane for $65,000 for the benefit of husband John and for a like amount against accidental death, and so seeks recovery to the husband as beneficiary for $130,000, together with penalty and attorney fee. Count II alleges that Policy L–71342 insured the life of Diane for $10,000 for the benefit of husband John and for a like amount against accidental death, but seeks recovery for *only $10,000* together with penalty and attorney fee.

The brief of husband John, however, modifies the pleaded contention for damages under Count II to $4,000 together with penalty and attorney fee. Neither the pleading nor the brief articulates the logic of either demand. For internal consistency that is, with the pleaded premise that wife Diane was an *Insured* together with husband John—Count II should plead a

recovery for $16,000—that is, the $10,000 face amount payable to a beneficiary plus $10,000 accidental death indemnity, less $4,000 paid by MFA and accepted by husband John. The *modified demand in the brief under Count II* also lacks a consistency with the basic pleaded premise that wife Diane was an *Insured*—that is, that MFA "insured the life of said Diane Spychalski in the sum of $10,000 for the benefit of the plaintiff." In that case, the accidental death would benefit husband John in the sum of $20,000, less the $4,000 already paid by MFA, and not merely an additional $4,000 for, we assume, the accidental death.

Neither the petition nor the exposition in the brief articulates how the ad damnum under Count II is derived. The disparity between the essential allegations of Count II and the ad damnum, both as pleaded and as modified in argument, do not conform to the essential cause of action pleaded by Count II. In a word, there is doubt on what theory the husband seeks remedy.

The court received evidence on the petition. The husband John described the circumstances which induced the purchase of Policy L–91470 [$65,000 face value] from MFA agent Barber by both husband John and wife Diane and their expectations of coverage. In gist, they had made purchases of insurance coverages from Barber and MFA on other occasions, which included a life policy for $10,000 [Golden Family Policy L–71342]. The husband was about to leave employment with the Goodrich Company and "the life insurance I had on her and myself with them. So, we were going to buy more life insurance, what we could afford, called [Barber], he came out."

Q. What did you tell Ed Barber you wanted?

A. My wife and I had talked about getting more insurance since I was leaving the company that I had been working for and wouldn't have additional life insurance any longer on us, so Mr. Barber came out to the house and we wanted to talk to him about a plan or some type of insurance that would cover us if something happened to either one of us. We didn't know what we could afford, and this is the policy that he suggested and we bought this policy from him.

\* \* \* \* \* \*

That's the insurance policy that my wife and I purchased from MFA Insurance Company in 1974 for $65,000.

Q. Now, did you ask for $65,000 worth of insurance before that was issued?

A. No, not exactly, I didn't ask for the amount. We didn't know what we could afford. It was a lot of money and that's what we wound up buying from Mr. Barber.

Q. So you asked for as much insurance as you could afford?

A. Yes, sir.

The application was completed by agent Barber after the husband and wife gave answers to his questions. The husband, alone, signed the form after only a glance:

Q. Did you look at it when you got— when you signed it?

A. Just glanced at it and signed it.

Q. Did you see that the blank for whether or not your wife was to be covered in the $65,000 policy was marked "Yes"?

A. I didn't look at it at that time, no, sir.

Q. Did you at any other time?

A. When I came to see you. When I looked at it before that, after they denied the claim.

The husband testified also that the policy was delivered through the mail. He read neither the policy nor the application after receipt; nor, for that matter, had he read the first policy [L–71342, $10,000 face value] purchased from MFA. He merely looked at the face of each policy, visible in any event through the clear cellophane window of the leather container in which each came.

The evidence of the transaction was received over objection of the insurer that the conversations between the putative insureds and agent Barber antecedent to the issuance of the policy merged into that written document, and that the plain terms of the contract of insurance show the husband as *an insured, not a beneficiary*, and that such an unambiguous term was not subject to explanation or variation by parol evidence. The court allowed the testimony, however, to show the full insurance policy transaction. The court determined that the evidence of the transaction by the plaintiff proved *no agreement* by MFA to insure the life of wife Diane:

The insurance in the $65,000 policy No. L–91470 was on John Spychalski. The insurance on the $10,000 policy No. 71342 was on the life of John Spychalski with a 40% benefit provided in the event of the death of the insured's wife. While ambiguities are to be construed against the company, to provide coverage in this case would accomplish a rewriting of the policy.

Thus, entry of judgment for the insurer at the conclusion of the evidence of the plaintiff rests on the ground that the designa-

tion of *Insured* in each policy was clearly and unambiguously husband John only.

Each litigant on appeal contends for the *unambiguous* effect of the insurance policy *Insured* designation to sustain position under Count I of the petition. The husband argues that by operation of law the application for insurance affixed to the issued policy [L–91470 for $65,000] was integrated into that document, and that the entries on the application in the hand of agent Barber—taken at clear intendment—show a purpose to designate wife Diane as an Insured.[3] The insurer MFA argues, as before, that the policy is unambiguous, that the policy designates husband John only as the *Insured*, and if the application entry somehow tends to suggest an intention to insure wife Diane, nevertheless, the husband is bound by the policy as issued after retention for an unreasonable time without cavil. MFA argues also, that whatever the role of extrinsic evidence, the testimony of the plaintiff was not competent to vary a written term of agreement.

■ The application became an integer of the contract of insurance both by the terms of Policy L–91470 and by the effect of law. *Howard v. Aetna Life Ins. Co.*, 350 Mo. 17, 164 S.W.2d 360, 366[1–4] (1942). Those integrated terms, therefore, are the subject matter of the Count I litigation. The insurer and insured-putative benefi-ciary pose the ambiguous nonambiguous-dichotomy as the basis to gain or defeat recovery. Thus they propose, alternatively, the *contra proferentem* or plain language maxims and other conventions for the construction of *negotiated contracts* as the means to determine the rights of the parties to an insurance policy. Our law distinguishes, rather, between a contract *consented to by negotiation* and a contract *assented to by adherence*. The one [at least, as paradigm] describes a bargain between equals; the other, a form with standard terms imposed upon the applicant to take or leave. *Estrin Construction Co., Inc. v. Aetna Casualty & Surety Company*, 612 S.W.2d 413, 418[4–6] (Mo.App.1981). The basic purpose of contract law is to protect the reasonable expectations induced by agreements. 1 Corbin on Contracts § 1 (1960). Thus, whether assent to contract rests on negotiation or only on adherence, the rules of construction subserve to give effect—as nearly as possible—to the expectations which induced agreement. *Linderer v. Royal Globe Insurance Company*, 597 S.W.2d 656, 661 (Mo.App.1980).

■ A life insurance policy is a contract of adhesion.[4] Meyer, Life and Health Insurance Law § 2:3 (1972). The terms of such a contract, by almost universal practice, are not read—nor are they expected to be read.[5] That is because—except for the

---

3. The plaintiff temporizes somewhat. He argues alternatively that if ambiguity nevertheless is found [presumably, between the application entries—which we discuss later—and the designation of husband John as sole *insured* on the face of the policy], the usual rules of construction in a manner most favorably to the insured apply to sustain recovery.

4. The contract of adhesion as an incident of our mass production and mass consumption society and the implications of that reality for the determination of legal rights derived from those form transactions are more fully discussed in *Estrin Construction Company, Inc. v. Aetna Casualty & Surety Company*, 612 S.W.2d 413 (Mo.App.1981). See, also: Corbin on Contracts § 559 (Kaufman Supp. 1980); Restatement (Second) of Contracts 2d § 237 (Tent. Draft 1973); Keeton, *Insurance Law Rights at Variance With Policy Provisions*, 83 Harv.L. Rev. 961 (1970); Slawson, *Standard Form Contracts and Democratic Control of Lawmaking Power*, 84 Harv.L.Rev. 529 (1971); Leff, *Contract As Thing*, 19 American U.L.Rev. 131 (1970), among others.

5. There are ready reasons why the assumption that neither an insurer nor an insured expects that the policy, other than for a perfunctory glance, will be read after receipt validly describes actual practice. For one thing, they both know that a policyholder will not understand the printed words even if read. See, Keeton, Honoring Reasonable Expectations in the Interpretation of Life and Health Insurance Contracts, 1971 ABA Sec. of Insurance, Negligence, and Compensation Law, 213, 217; *Marston v. American Employers Insurance Co.*, 439 F.2d 1035, 1038 (1st Cir. 1971). For another, the insured has no choice but to take the policy or leave it, and so the transaction gives no incentive for informed conduct. *Estrin*, supra, l.c. 424; *C & J Fertilizer, Inc. v. Allied Mutual Insurance Co.*, 227 N.W.2d 169, 174 (Iowa banc

cost, the term, the monetary limits of coverage and, in a very rough way, the risks to be covered—the words are not the subject of the transaction, the product or service is. *Estrin*, supra, l.c. 424; *Marston v. American Employers Insurance Co.*, 439 F.2d 1035, 1038 (1st Cir. 1971); Annotation: *Insurance Contracts—Unconscionability*, 86 A.L.R.3d 862, 865; Leff, *Contract As Thing*, 19 American University L.Rev. 131, 157 (1970). In an adhesion contract, therefore, the assent is resembled rather than actual. The printed words are not enough to disclose the expectations of the parties. The court must look for that purpose to the full circumstances of the transaction—whether the written words of the contract be ambiguous or unambiguous. *Estrin*, supra, l.c. 419; *Corgatelli v. Globe Life & Accident Insurance Co.*, 96 Idaho 616, 533 P.2d 737, 740[2] (1975); Restatement (Second) of Contracts 2d §§ 226 and 227 (Tentative Draft 1973); 3 Corbin on Contracts §§ 534 through 542 (1960).

The pleadings under Count I allege that *as issued* Policy L–91470 insured the life of wife Diane for the benefit of the husband in the sum of $65,000 with an additional $65,000 benefit for the accidental death of the wife. The standard form Policy L–91470 *as issued* incurs to a person in the

position of the policyowner [6] no reasonable expectation that a spouse of the designated *Insured* was also an *Insured* to the benefit of the other spouse. Rather, the form in conspicuous print [on the page normally visible through the window of the policy packet as folded and delivered] and immediately visible when the document is removed from the jacket displays:

| Insured | Spychalski, John |
| --- | --- |
| Face Amount | $65,000 |
| Beneficiary | As Defined On Page 4 |
| First Premium | $332.95 |
| Total Premium By Mode Of Payment | Annually $1,269.00 |

These are the few terms usually negotiated, or at least, to which an insured manifests an overt assent in an otherwise adhesion transaction. The name of wife Diane nowhere appears *on the printed form*. The definition of *Beneficiary* on Page 4 to which the conspicuous print refers recites only:

"*Beneficiary.* Unless otherwise provided by endorsement hereon or attached hereto, the Beneficiary for insurance payable upon death of the Insured shall be as stated in the application attached hereto."

1975). Rather, one purpose of the standard form is to eliminate negotiation over the details of an individual transaction and the review of the standard terms by most customers [usually by counsel] would subvert the premise of mass transactions. Restatement (Second) of Contracts 2d § 237, Comment b (Tentative Draft 1973). Yet another, and equally dominant, reason for a valid expectation that the insured will not read the policy is, simply, that typically—as in this case—the policy is not delivered to the insured until *after* the completion of the transaction. "Purchasers of insurance usually do not even receive their policies until after the purchase and probably not one insured in a hundred reads his policy in an understanding manner even then." Slawson, *Standard Form Contracts and Democratic Control of Lawmaking Power*, 84 Harv.L.Rev. 529, 540 (1971). One text authority finds that even lawyers fall into the same lapse: "Experience shows that ... some lawyers share the reluctance of laymen to read the policy. This statement is supported by the fact that, to the author's knowledge, in some cases suit is brought for a lesser benefit than the policy provides, or some bene-

fits are overlooked." Meyer, Life and Health Insurance Law, § 2:3 (1972).

**6.** A standard contract, by the very nature, addresses the mass of users and so describes a *typical transaction* rather than the *individual transaction* which results from a negotiated assent. Thus, the adherent assents—except as to those few terms actually negotiated—to the *type of transaction* embodied in standard form. "Such a writing is interpreted wherever reasonable as treating alike all those similarly situated, without regard to their knowledge or understanding of the standard terms of the writing." Restatement (Second) of Contracts 2d § 237(2). *Estrin*, supra, l.c. 423; *C & J Fertilizer, Inc. v. Allied Mutual Ins. Co.*, 227 N.W.2d 169, 175[9] (Mo. banc 1975); 3 Corbin on Contracts § 559 (1960) and (Kaufman Supp.1980); Slawson, *Form Contracts and Democratic Control of Lawmaking Power*, 84 Harv.L.Rev. 529, 544 (1971). Thus, it is not the reasonable expectation of the singular policyholder to which the law gives effect, but that of the average member of the public who accepts it.

The application form [entry 24] designates wife Diane as primary beneficiary and children Scott and Cynthia as contingent beneficiaries. No entry on the application form designates wife Diane as *Insured*.

Nor does the full transaction sustain prima facie proof under pleaded Count I of a reasonable expectation to a policyowner that wife Diane was an *Insured*.

The testimony of the husband was that he and wife Diane enlisted MFA agent Barber, their *regular* consultant on those matters, to supplant the life insurance coverage on both about to be lost by the termination of his current employment. They informed the agent what they could afford [presumably the $1,269 annual premium paid for Policy L–91470] and left it to Barber to devise a coverage to the benefit of each on the death of either. They did not prescribe the $65,000 face amount of coverage of the policy as issued. The husband explained: "this is the policy that [Barber] suggested and we bought this policy from him." The inquiries on the application were directed [according to the husband] by the agent to both of them, and [according to agent Barber] only to the husband. The agent completed the application form which the husband signed after only a glance. The policy was received but not read until after the death of the wife.

The insurer contends that the parol evidence of the husband on the transaction with agent Barber was not competent to vary the terms of the insurance contract, otherwise clear by the plain language that husband John, alone, and not conjointly with wife Diane was the *Insured* under the Policy L–91470, whatever other intention they harbored. We accept for the purpose of contention that the terms in issue—the persons to be insured and the risks covered—were subjects of bargain between the agent and the husband [and wife] so as to invoke the rules of construction of negotiated rather than adhesion contracts. The admission of the oral testimony of the husband to describe the course of transaction which culminated in the issuance of the policy was nevertheless valid. The contract of insurance comprised not only the policy form but also the application. The two components became integrated into an "entire contract," not only by explicit policy term but by operation of law. *Lipel v. General American Life Ins. Co.*, 192 S.W.2d 871, 874[1] (Mo.App.1946). The plaintiff husband contends that the entry to question 26 on the application form, done in the hand of the agent, shows coverage for Diane, as the husband and wife expected and that Barber understood that expectation:

26. Complete this question if Family Policy (Life or Health) is applied for. *Print full names of all persons proposed for coverage. SHOW WIFE'S MAIDEN NAME IN PARENTHESIS. Family coverage is to apply on*

[X] Life    [ ] Health    [ ] Both

Spouse   Diane M. (Whitacre)   [emphasis added]

Thus, there was a disagreement between the contractors as to sense and effect of the written words employed between them. The husband contends that the answer to item 26 shows the wife, as well as himself, was a person expected for life insurance coverage. The insurer contends [by answer to interrogatory] that the entry to item 26 was a mistake and inadvertence and [in argument] that, in any event, a spouse under a Family Policy by definition is not an additional *Insured*.

■ Where the principals to a negotiated contract dispute the effect of the agreement, a court—quite apart from ambiguity or nonambiguity—is entitled to look at more than only the words of undertaking. The situation of the principals and the context of the transaction are relevant to interpret the prevalent meaning of the words used for contract. *Cure v. City of Jefferson*, 380 S.W.2d 305, 309[1, 2] (Mo.1964); Restatement (Second) of Contracts 2d §§ 226–228 (Tent. Drafts Nos. 1–7, 1973). That evidence does not vary written terms of contract but only aids to discern the prevalent sense of the terms and, hence, the reasonable expectations of the principals. *Foley Co. v. Walnut Associates*, 597 S.W.2d 685, 689[7] (Mo.App.1980); 3 Corbin on Contracts §§ 542–545, 35 et seq. (1960).

The evidence of that transaction was that the husband was about to leave his employment and so lose the life insurance coverage on both himself and his wife which was an incident of that employment. They had purchased other insurance coverages from agent Barber, including an MFA $10,000 life insurance coverage [Golden Family Policy L–71342]. They called Barber to their home and informed him of the imminent loss of life insurance coverage and talked to him "about a plan or some type of insurance that would cover [them] if something happened to either one of [them]." They prescribed no specific type of limit of coverage only for coverage on each of them for the benefit of the other on the death of either at a cost they could afford. Nor did they know what they could afford and left the matter entirely to agent Barber. They purchased the policy [L–91470] agent Barber informed them would meet these needs.

It was the contention of the husband at the trial, and now on appeal, that the policy as issued insured [or, at least, intended to insure] the life of wife Diane to the benefit of husband John for $65,000 and an additional like sum in the event of her accidental death.[7] The policy accords those benefits only to an *Insured*. The contention of the husband means, in effect, that wife Diane was an *Insured*—actual or intended—under Policy L–91470. We have found that the evidence by the plaintiff of the total transaction—the exchange between the husband and wife and agent Barber, the application entries and the terms of Policy L–91470 as issued—allows no reasonable expectation that wife Diane was an *Insured*. The husband assumes that the entry to application item 26 which describes *Diane M. (Whitacre)* as a *person proposed for coverage* means, when integrated into the policy, that wife Diane was proposed as as *Insured*. That does not follow, nor do the application entries disclose an expectation by any rule of adhesion or negotiated contract to constitute wife Diane as *Insured*.[8] The cause of action the plaintiff tends to prove does not rest on assent—manifest or

---

7. Policy L–91470 insures the life of husband John on those terms to the benefit of wife Diane. It is the contention of husband John, as beneficiary, that the policy also insured Diane to his benefit on the same terms.

8. The application form makes a uniform distinction between *proposed insured* and *person proposed for coverage*. In each entry for *proposed insured* [items 1, 28, 29–44 and the signatory paragraph] the name of husband John, alone, is entered or the personal information concerning him alone, is recorded. The *persons proposed for coverage* entry 26, however, is answered by the name of wife Diane. The entries 29–44 for the personal history of a person applying for coverage, however, does not record any data for the spouse [Diane]. The policy, as issued, conspicuously names John and none other the *Insured*. Diane is named the primary beneficiary in the application and, by reference, in the formal policy. The application describes Policy Applied For [item 17] as *Whole Life* and the cover page of the policy as issued describes the coverage as Whole Life Policy. The significance is that, in the normal scheme of the prescribed MFA life insurance coverages [at least, to the extent the evidence bears on that subject], a spouse becomes another *person covered* under the Golden Family Policy [such as Policy L–71342 earlier issued to husband John and under which the 40% of the face amount of coverage [$4,000] was paid to husband John as beneficiary of wife Diane] and not under a WHOLE LIFE POLICY. These entries, the evidence of the plaintiff contends, were not as expected from the negotiations with agent Barber. The policy as issued, the evidence of the plaintiff contends, was not as expected from the negotiations with agent Barber.

An application for an insurance policy, no less than the policy, itself, may impose terms and may contain unexpected or hidden provisions contrary to the dominant purpose of undertaking, and so be governed by principles of adhesion contracts. The terms of the application in dispute, however, are not any predetermined provisions, but those actually the subject of negotiation between the applicants-insureds and the agent for the insurer. Terms the result of manifest assent, even in the context of an adhesion insurance policy, are construed according to the usual rules of negotiated contracts within the full circumstances of undertaking. Corbin on Contracts 559B (1 Kaufman Supp. 1980).

In a word, the evidence—despite the formal allegations of Count I—does not prove any reasonable expectation of coverage on the negotiated or other terms of the application or Policy L–91470, but an expectation from a promise for coverage, relied on to his detriment.

resembled—but on a promise for coverage negotiated but not recorded in the application so that the policy as issued was not as expected. The sense of the evidence by the husband, rather, was a promise by agent Barber to the applicants-spouses that a policy would issue with wife Diane as a *person covered* [rather than that the policy as actually issued constitutes wife Diane an *Insured* as the husband pleads and argues]. The *promise* was for coverage under a single insurance policy on the life of each spouse to the benefit of the other. The evidence was that the *coverage as issued* was not the *coverage as promised.* Thus, the cause of action the evidence proves, if at all, does not rest on reasonable expectation from contract but on some precontractual or extracontractual promise.

Count I was pleaded, litigated and adjudicated on the theory that the insurance contract as issued constituted wife Diane an *Insured* so as to invest the husband with a claim for the double indemnity for her accidental death. We have determined from the total transaction that the insurance contract allowed no reasonable expectation to a policyholder in the position of the husband that the wife was an *Insured* to his benefit. The evidence suggests an extracontractual remedy—for instance, a cause of action for promissory estoppel. The plaintiff does not assert that remedy nor otherwise seek the efficacy of a noncontractual recovery. The theory on the trial was on the contract. Judgment was entered on that theory. Appeal is on that theory. The plaintiff does not even seek the effect of Rule 55.33(b) to conform the pleadings to the evidence. The plaintiff, rather remains bound to his contract theory, and we will not convict the trial court of an error on an issue not presented to that tribunal for decision, nor to us on review. *Bunting v. McDonnell Aircraft Corporation,* 522 S.W.2d 161, 168[11] (Mo.banc 1975).

The judgment on Count I is affirmed.

Count II pleads a cause of action on the theory that MFA Policy L–71342 insured

the life of wife Diane to the benefit of husband John in the face amount of $10,000 and for an additional $10,000 indemnity for her accidental death. The ad damnum of Count II, however, pleads for only $10,000 together with $400 penalty and $1,000 as an attorney fee [presumably under § 375.420]. The husband admits he received payment of $4,000 from MFA under the policy. The husband reduced the claim for damages at the conclusion of the evidence to an additional $4,000 as an accidental death indemnity.[9] The husband claims recovery on the terms of Policy L–71342 as issued. He does not contend for any favorable rule of construction from ambiguity, but only that the terms of the policy are favorable to the pleaded recovery.

■■ A policy of insurance as a contract of adhesion will be given effect according to the objectively reasonable expectations of the insured or beneficiary as to the terms. Those expectations do not reside altogether in the words—ambiguous or unambiguous—but in the total transaction. *Estrin Construction Company, Inc. v. Aetna Casualty & Surety Company,* supra, 612 S.W.2d 413, 420[10] (Mo.App.1981). There was no evidence on Count II other than the policy itself; that was the total transaction shown, therefore, any expectation derives to the husband from the written terms. However, even terms which are clear, but hidden or otherwise unfair to the dominant purpose of the policy, may yet be contrary to the reasonable expectations of an average person in interest in such a policy. Restatement (Second) of Contracts 2d § 237, Comment f; Corbin on Contracts § 559G (Kaufman Supp.1980). Thus words alone, however clear, do not determine the effect of a policy in favor of the insurer any more than words alone, however ambiguous, determine the effect in favor of an insured: the dominant purpose of the policy within the context of transaction does. *C & J Fertilizer, Inc. v. Allied Mutual Ins. Co.,* supra, 227 N.W.2d 169, 172[2] et seq. (Iowa banc 1975); *Rotwein v. General Accident*

---

**9.** The anomaly between the pleaded Count I cause of action and the ad damnum and the

posture of present contention is described fully in footnote 2.

*Group,* 103 N.J.Super. 406, 247 A.2d 370, 377[13–15] (1968); Annotation: Insurance Contracts—Unconscionability, 86 A.L.R.3d 862 § 4.

■ Count II contends that the clear terms of Policy L–71342 [in terms of our analysis—the reasonable expectations from the policy within the context of transaction] constitute wife Diane an *Insured* so as to entitle husband John to a $4,000 indemnity for her accidental death in addition to the $4,000 already paid him by MFA. The husband does not suggest any variance between the application and the policy as issued, nor any surprise, unfairness or even "ambiguity" among the policy terms but only that the terms *as such* constitute [by reasonable expectations] wife Diane an *Insured.*

There was testimony, typical of such a transaction, that the policy was delivered to the husband after the completion of the application, and was received but not read. The application was attached as a physical integer of the policy. We infer from the original entries on the application that the items of premium cost, the general risks covered, the monetary limits and the designations of *Insured* and beneficiary—also typical of such a transaction—were terms of insurance discussed, given manifest assent by the applicant-insured, and separately added. These were also the added terms in the insurance policy as issued. There were other added terms in the application— such as, that the exact plan intended for issuance [item 17] was the Golden Family coverage in the face amount of $10,000. Thus, Policy L–71342 issued as a form MFA Golden Family Policy with these printed terms and typewritten insertions in juxtaposition:

| Standard Terms | Added Terms |
| --- | --- |
| INSURED | Spychalski, John |
| FACE AMOUNT | $10,000 |
| BENEFICIARY AS DEFINED ON PAGE 4 | |
| MODE OF PAYMENT | Annually—$238.30 |

The Beneficiary as defined on Page 4 refers to the entry on the application [integrated into the issued policy] which, in original hand, describes wife Diane as the primary beneficiary and children Scott and Cynthia as contingent beneficiaries. These same spouse and children became *persons covered* by Policy L–71342 which issued in accordance to the MFA Golden Family Policy plan designated in the application. These same spouse and children were *persons proposed for coverage* under the Golden Family Policy plan designation inserted in item 17 of the application. These entries, presumptively negotiated, are given greater weight than the form terms of the policy to determine the dominant purpose of the transaction of an applicant-insured and an insurer. Restatement (Second) of Contracts 2d § 299(d), § 237 comment c; Corbin on Contracts § 559D (Kaufman Supp.1980). That is because as to these terms the applicant-insurer had a real choice. *Powell v. Central California Federal Savings and Loan Association,* 59 Cal.App.3d 540, 130 Cal.Rptr. 635, 641[7, 8] (1976).

The policy as issued integrated every term negotiated in the application: designation of husband John as the *Insured,* the wife and children as primary and secondary beneficiaries, a $10,000 face amount, a premium paid in the sum agreed, and an MFA Golden Family Policy as specified. Quite anomalously, the husband does not contend that an exception in the written policy unfairly nullifies any of these provisions or otherwise contradicts the prevalent sense of the transaction. Rather, he claims that because the policy protects the life of the wife at all [40% of the face value, or $4,000], that life is entitled to the full protections accorded to the *Insured.* That contention translates [redundant of Count I] a *person covered* in the application to an *Insured* in the policy.[10] The full logic of that contention, however, would constitute not only the *Insured's spouse* [wife Diane] but also the

---

**10.** The MFA Golden Life Policy L–71342, typical of the versatile coverages now available on the life insurance market [See, Meyer, Life and Health Insurance Law § 3:1 (1972)], combines a term life insurance with an accidental death indemnity, a term benefit, a nonforfeiture op-tion for conversion into other insurance, among others. The special feature of that insurance plan, however, is a family plan which rests on the spousal or [in this case] parental status of the *Insured* to extend benefits to other *covered persons,* [in this case] the wife and the chil-

*Insured's children* as policy *Insureds.* That would mean that an indemnity would accrue not only upon the accidental death of the wife but upon the accidental death of each or both of the designated children.[11] Furthermore, the indemnity for accidental death doubles the face amount of the coverage—$10,000—and not the percentage of the face amount payable upon the death of the spouse [40%, or $4,000] or any of the children [20%, or $2,000]. Thus, the contention of the husband quadruples the risk of the insurer for accidental death, a reasonable expectation not open to an applicant for the coverage.

The average applicant for life insurance understands that a life insurance company markets the coverages by a premium schedule commensurate with the risk. Such an applicant has reasonable expectation that the designated *Insured* and other *persons covered* negotiated in the application and conspicuously identified in the issued policy shall have the protection the policy terms—assented to or adhered to—augur. The policy as issued fulfills that reasonable expectation by any objective standard.

The judgment for MFA on Count II of the petition is affirmed.

All concur.

dren. The focus of the multiple coverages is, by the prevalent sense of the policy provisions, one *Insured,* a spouse, in terms of whom the coverages and benefits to the other family members are defined. The application describes that scheme of insurance and the cover page of Policy L–71342 declares the terms in emphatic print:

"MFA LIFE INSURANCE COMPANY ... AGREES TO PAY The Face Amount to the Owner if the Insured is living on the Maturity Date, or to the *Appropriate Beneficiary,* as defined in the policy,
(A) the Face Amount (plus any additional amount under the 10–Year Term Insurance Benefit and Accidental Death Benefit Provision) upon receipt of due proof of the death of the *Insured* ...

(B) 40% of the Face Amount upon receipt of due proof of the death of the *Insured's spouse* ...
(C) 20% of the Face Amount upon receipt of due proof of the death of *any child of the Insured* ...."
[emphasis added]

11. The husband does not show, other than to assume the validity of the premise of argument, an interest as a beneficiary—a prerequisite to maintain the contention for a death benefit. *Boyle v. Colonial Life Ins. Co. of America,* 525 S.W.2d 811, 814[2] (Mo.App.1975). That benefit, by express policy provision, is payable to the beneficiary. The beneficiary, in turn, by other policy provision, is as designated in the application. The wife and children only are the described beneficiaries.