Edwin M. KRIGEL, Appellant,

v.

**FEDERAL INSURANCE COMPANY, Respondent.**

**No. WD 37827.**

Missouri Court of Appeals, Western District.

Dec. 30, 1986.

Motion for Rehearing and/or Transfer to Supreme Court Denied Feb. 3, 1987.

Application to Transfer Denied March 17, 1987.

Lloyd S. Hellman and P. Blake Keating of Sandler, Belkin, Hellman & Weinstein, Kansas City, for appellant.

Michael E. Waldeck, James M. Yeretsky, & Thomas B. Alleman of Niewald, Waldeck, Norris & Brown, Kansas City, for respondent.

Before SHANGLER, P.J., and MANFORD and BERREY, JJ.

MANFORD, Judge.

This is a civil action upon a first party claim under a policy of insurance and for damages for alleged vexatious refusal to pay the proceeds of the policy. The judgment is reversed and the cause remanded.

Appellant has presented five points which, in summary, charge the trial court erred in (1) permitting, over objection, a witness to testify as to details of extra-judicial conversations; (2) sustaining respondent's objections to certain interrogatories; (3) refusing to submit a withdrawal instruction regarding the limited admissibility of certain testimony; (4) ruling that the policy of insurance in dispute was not ambiguous; and (5) admitting, over objection, a certain exhibit pertaining to the policy of insurance in dispute.

Before proceeding with a summary of the pertinent and applicable facts found of record, some preliminary remarks are in order. The trial of this matter spanned several days, producing hundreds of pages of transcript and dozens of exhibits. Unfortunately, as well, the trial was plagued with persistent and unnecessary acrimony which continuously tried the patience of the trial court.

On another note, quite often when a judgment is reversed, not all of the points presented on appeal are addressed, due either to judicial expediency or simply because disposition renders the ruling of them unnecessary. However, our courts have, on occasion, taken up either all the points presented or a portion of them, and have ruled the same on the premise that any future proceedings should avoid the commission of like errors and/or render void any assertions that the same issues giving rise to those errors still prevail. It is that premise which causes this court to take up all points raised herein and to rule the same.

Appellant is Edwin Krigel, who was plaintiff at trial and who hereinafter is referred to as Krigel. Respondent is the Federal Insurance Company, which was defendant at trial and which hereinafter is referred to as Federal. When this cause originated, there was a co-defendant, one Richard Atlas, the former insurance agent for Krigel. At the close of Krigel's opening statement and upon motion by Federal, all claims against Atlas were dismissed. Stated in simple terms, the position of the

parties is as follows: Krigel has maintained that he sustained a loss, by burglary, in excess of $500,000.00. In addition, he has maintained that the policy of insurance covering his loss provided coverage in the amount of $613,909.80. Krigel further maintains that the refusal to pay his claim has been vexatious and he is therefore entitled to damages. Federal has maintained that Krigel participated in the burglary of his own store and that is a defense for nonpayment, and hence there was no vexatious refusal to pay.

The cause was tried to a jury, which returned its verdict for Federal. The following factual summary is, where applicable, supplemented within the disposition of the points on appeal *infra*.

At the time this dispute arose, Krigel was the owner/operator of Krigel's Diamonds and Jewels, located at 1001 Main Street, Kansas City, Missouri. Federal, at this same time, was the insurance carrier for Krigel through and by virtue of "an all risk jeweler's block insurance policy." On the weekend of May 22–24, 1982, Krigel's Diamonds and Jewels was burglarized. The record indicates that Krigel's store had been burglarized in 1974, and that in 1974, insurance coverage was provided by the Insurance Company of North America. That loss was paid and I.N.A. refused to continue coverage.

Atlas then placed insurance coverage with Federal. Krigel paid the premiums during the following years. No other major loses were claimed between 1974 and 1982. Each year, Atlas and Krigel would conduct an annual review of the policy and a decision relative to coverage would be reached. Such a review was conducted, during which Krigel was offered and requested 100% appreciation coverage on his inventory. Krigel paid the premium for such coverage. The extent of coverage was at issue at trial and the facts surrounding that issue are set forth in more detail, *infra*. At this point, it suffices to state that Krigel has maintained that the

policy coverage was $613,989.80 and Federal has maintained the limit was $370,-000.00.[1] Before Federal would renew coverage for the year 1982, Krigel was required to upgrade his burglary alarm system to what was called a 2AA level. Krigel complied with the requirement approximately a year after being requested to do so. The system was a "sensor type system" designed to detect movement inside the store when activated. Also available was an alternative form of coverage to the 100% appreciation coverage which would have required Krigel to have submitted an item-by-item valuation of his inventory. Krigel opted for the appreciation coverage.

The first witness called was one Steven Fisher who was the local manager of the underwriting department for Federal. Through Fisher, Krigel attempted to establish the need and existence of loyalty between an insured and insurer. Fisher's testimony established that Krigel had a claimed inventory value (less appreciation) of $306,994.00. Fisher also stated that although the policy contained an endorsement for 100% appreciation coverage, that did not affect or change the basic policy limit of $370,000.00. Fisher and others testified that the 100% appreciation applied to any one jewelry item, but the total coverage was limited to $370,000.00. Fisher testified that Krigel did not pay any premium which would have raised coverage on the inventory to $613,989.80. Through Fisher and others, it was established that Krigel housed his inventory (during non-store hours) in two safes located in the store, and that the backs of these safes were against the south wall at the rear of the store.

Krigel introduced photographs of the burglars and tools used in the commission of the burglary. He also introduced various police investigative materials. He then called one Jack Krashin, who was Krigel's store manager at the time of the loss. Krashin described the daily store routine. He stated that about 6:15 p.m. on May 22, 1982 (Saturday), he and Krigel activated

**1.** The policy provided for coverage of $470,-000.00 during a four month "holiday period" which has no application to these proceedings.

the alarm and locked up the store as they normally would have done. Krashin also explained the code system by which the Krigel stock was identifiable through tags attached to the various items of the stock.

The building in which Krigel's store was located was destined for destruction as part of a renewal project in downtown Kansas City. Krashin testified that he accompanied Krigel to locate another possible store location. At the time of the burglary, the building housing Krigel's store was vacant except for Krigel's store. Krashin testified that the building owner had provided Krigel with a key to the vacant portions of the building to allow for entry by utility workers. This key was borrowed at various times by workmen.

Krashin further testified that he had been away from his home the evening of May 22, 1982, and upon his return was advised by his daughter that he had received a phone call from the alarm company. Krashin did nothing because it was late, the alarm company had not called a second time as was the practice if the system continued to indicate something wrong, and because, as he put it, "we were always getting false alarms and I didn't give it a second thought." Krashin returned to work at about 8:00 a.m. on Monday, May 25, 1982, and went to the rear of the store. He observed a white substance on the floor. He opened the safes and discovered holes in the backs of the safes and a hole in the wall to rear of the backs of the safes. He first called Krigel and then called local police. When the police arrived, Krashin accompanied them next door (1003 Main) into the vacant portion of the building. The front door to this portion of the building was unlocked. Krashin and the police observed two holes in the wall in the adjoining vacant space. They also observed various tools used by the burglars, along with some items from Krigel's stock. Krashin, some two days later and under Krigel's supervision, commenced an inventory. He also testified that the police had shown him photos and that he told the

police that one of the men had been in Krigel's on a previous Saturday.[2] Krashin stated that he had never seen a completed inventory list, nor had he had any dealings with Federal on the claimed loss. He stated that there was only one key to the vacant portion of the building. In addition, he verified that the holes in the walls (both in Krigel's store and the vacant space) lined up precisely with the backs of the two safes. Krashin later identified various jewelry items recovered by the F.B.I. and local police.

Krigel then called Doris Creswell, his bookkeeper. She explained the method by which she attempted to ascertain the loss. Part of this procedure included contact with manufacturers and suppliers to ascertain costs for various items. She then compiled a summary. By her calculation, the total book value of the loss was $380,-657.33, which did not allow or include appreciation. She stated that a proof of loss was submitted on November 8, 1982, over five months after the claimed loss of May 22–24, 1982.

Krigel then took the stand. He explained how his business had grown out of a prior business with his brother and then moved to its final location at 1001 Main. He explained the bookkeeping and record procedures he employed. He stated that an inventory of his stock had been completed in January, 1982. Further, he testified to his several attempts to find a suitable relocation for his store. He denied ever meeting or knowing Bobby Gene Jones, Vince Picone, or other persons involved in the burglary. He stated that he secured the appreciation coverage on his stock due to the fluctuation of gold prices. Krigel testified to the annual review procedure mentioned above. He stated that he subsequently compared the appreciation endorsement which contained the $613,989.80 figure with the remainder of the policy and this led him to conclude that he had coverage of $613,989.80 on his inventory because of the endorsement.

2. The photo identified Bobby Gene Jones who burglarized Krigel's, along with two accom- plices.

He further testified that he received a call from the alarm company between 6:20 and 6:40 a.m. on Monday, May 25, 1982. He said he followed the normal procedure of awaiting a second call, but received none. His next contact was from Krashin, and he arrived at his store about mid-morning. Upon arrival, he observed the holes in both walls and the backs of the safes. Krigel described the method employed in the calculation of his claimed loss, and that on November 8, 1982, he submitted a proof of loss for $575,917.12.

Krigel stated that he received a letter dated March 15, 1983, denying his claim. This letter became a focal point at trial regarding the denial of the claim per se, plus the claim for vexatious delay. This letter reads as follows:

Dear Mr. Krigel:

Enclosed please find a copy of the Proof of Loss which you have filed with the company. By this letter, we are returning and rejecting the Proof of Loss for the following reasons:

1. The cause and origin of the loss is still under investigation by Federal authorities and the company hereby reserves the right to raise grounds pending the results of that investigation;

2. The amount of the loss claimed exceeds the actual loss, if any;

3. The claimed loss exceeds the limits of liability set forth in the policy.

Krigel stated that he considered paragraph one of the above letter to be an accusation of his filing a fraudulent claim. He went on to state that he had never been charged with a crime and had never been called before a grand jury. He did state that in the company of a criminal defense lawyer, he went to the offices of the F.B.I. and gave the F.B.I. his statement. He further stated that he had never received any statement of facts (prior to filing suit) from Federal upon which Federal was basing its position that he had filed a fraudulent claim.

On cross-examination, considerable time was spent on the physical arrangement of the interior of Krigel's store. Particular focus was directed to a customer counter in the rear of the store. It was Krigel's position that the two safes could be observed from this counter area. This was later disputed by the testimony of an investigating police officer and the thief, Bobby Gene Jones. Krigel contended that a person could "step off" the distance to mark the location of the two safes. He added that he never observed anyone doing so. When asked if he observed any other holes in the walls in the back of the safes (other than the two large entry holes), Krigel responded, "I don't remember."

Krigel then called one William Crowley, the local branch claims manager for Federal. Crowley was asked to identify several reports from the claim's adjuster. He also stated that initially, Krigel was cooperative and that he (Crowley) had no suspicions. Crowley testified that he requested documentation of the loss from Krigel, but was not provided such information until some six months later at the time the proof of loss was filed. Crowley testified that he developed a growing suspicion as the investigation of the burglary progressed and then concluded that the claim was fraudulent.

The next witness called by Krigel was one Craig Salvay who testified about efforts to locate a new store site for Krigel's store. This testimony was followed by one Edward Ruzicka, an attorney and retired insurance company employee. The purpose of Ruzicka's testimony was to advise the jury on insurance industry standards regarding the handling of claims. Krigel also attempted to have this witness interpret certain portions of the present insurance policy.

Krigel's presentation of evidence was interrupted and a defense witness was called out of order by agreement. This witness was the thief and burglar, Bobby Gene Jones. In his testimony, Jones admitted to having participated in nearly 1,000 burglaries. He stated that he presently is in the Federal Witness Protection Program. He gave the following account of the Krigel burglary: He stated that he was contacted by one Vince Picone about a jewelry store burglary. According to Jones, he and Pi-

cone met with Krigel at Krigel's store. He described the interior of the store. He also testified that he had burglarized Krigel's store at Krigel's request in 1974. As to the present burglary, Jones stated that he observed the location of the safes and the alarm system. He told Krigel that the job could not be done unless the precise location of the safes was determined. He suggested to Krigel that someone punch a small hole (above the tallest safe) through the wall in Krigel's store and through the wall in the adjoining vacant space, and place a welding rod through this hole to mark the location of the safes. He testified that a few days thereafter, by use of a key, he entered the adjoining vacant building and observed a coat hanger wire protruding through the wall. He claimed that he then marked the spot on the wall in the adjoining vacant space. Jones then described in detail the actual commission of the burglary and the various roles played by his accomplices and himself.

The Jones testimony was followed by another defense witness, Robert Spratford, who was a diamond expert and who offered testimony on the value of some of the Krigel inventory.

Krigel then offered evidence that his attorney's fees up to the time of the trial amounted to $88,430.00. By deposition, Krigel introduced evidence from one of the burglars, Melvin Westfall. Westfall claimed that he planned and executed the burglary and that Krigel was not involved in the matter. Westfall claimed to have determined the exact safe location by "pacing off" the distance while he was in Krigel's store appearing to be a customer.

On the defense side, Federal called one Balfour Rast, the investigating police officer. Rast described in detail his initial investigation. He stated there was no indication of entry into Krigel's store. Entry had been made through the rear of the adjoining vacant building and the safes were entered through the back of each via holes in the wall of the adjoining vacant space and the wall of Krigel's store. This officer testified that the safes could not be observed from the customer counter area

as previously claimed by Krigel. He stated that he repeatedly requested of Krigel a listing of items claimed stolen, but that Krigel never supplied the list. This officer went to California alone, after requesting Krigel to go with him, to observe some of the property recovered from the burglary. He stated that he called Krigel and asked about the "code" on the tags of various pieces of merchandise, but Krigel refused to supply him with information on the code.

Federal then called one Lester Leamon, who was the claims adjuster. This witness stated that Krigel never supplied him with a listing of the inventory, although he repeatedly requested it. He also noted his various reports to Federal and in them, his observation of Krigel's casual attitude about the matter. He stated that he had handled Krigel's 1974 loss and noted similar methods used by the burglars. These reports, it was revealed, were considered in Federal's issuance of the above denial letter. This witness also noted that although the policy did include the 100% appreciation endorsement, that did not change the $370,-000.00 maximum limit of the policy.

Federal then called one Michael Schlatman who testified he was an independent insurance investigator hired to make contact with the F.B.I. and local police concerning the criminal investigation of the Krigel burglary. Very little information was gained by Schlatman due to the confidential policy of the F.B.I. He reported to Leamon there was an on-going criminal investigation.

Federal then called one Michael Shanahan, an F.B.I. agent. His testimony is at the crux of Krigel's point (1) and is considered more in detail *infra*.

Shanahan was followed by one Linda Betzer, who was the U.S. attorney for the Federal Organized Crime Strike Force. She verified Schlatman's inquiries prior to the issuance of the denial letter and stated that Schlatman was given no details about the investigation.

Federal then called a local attorney, Spencer Brown, who gave his opinion that the March, 1983, denial letter included terms typical of the insurance industry.

He further testified that it is common practice for insurance carriers to deny claims upon circumstantial evidence.

Brown was followed by Federal's presentment of a deposition of Karl Nau, another F.B.I. agent. His testimony is so interrelated that it is also considered under Krigel's point (1) *infra.*

Richard Atlas, Krigel's former agent, was called and he testified that although the policy contained the 100% appreciation endorsement, the maximum policy limit remained at $370,000.00.

In rebuttal, Krigel called his girlfriend, Jan Wilcox, and his son, Stuart Krigel, to refute Jones' testimony that Krigel wore a mustache at the time of the burglary.

The evidence closed. The cause was submitted to the jury, which in turn returned its verdict for Federal. This appeal followed the overruling of a timely-filed motion for new trial.

Attention is now directed to Krigel's point (1), which is dispositive of this appeal. Krigel contends that the trial court erred in permitting the F.B.I. agent, Shanahan, to testify, over objection, as to the details of his (Shanahan's) interview with Jones some five to six months following the burglary. Krigel's position is that such statements stemming from this interview were extrajudicial and hence hearsay.

Federal argued at trial that such evidence, although hearsay, was admissible as an exception to the hearsay rule to show Federal's state of mind at the time Federal issued the March, 1983, denial letter.

This alleged error causes attention to be focused upon Shanahan's testimony. F.B.I. agent Shanahan was asked to testify as to the details of a statement he secured from Jones. In this statement, Jones implicated Krigel in the burglary. Federal contended that the evidence was admissible to show Federal's state of mind in denying Krigel's claim. There is no question or any dispute that such evidence would be admissible as an exception to the hearsay rule. Krigel argued that Federal was required to lay a proper foundation for the introduction of such evidence. Krigel's position was, and continues to be, correct on this point.

Nowhere in the Shanahan testimony was it ever disclosed that Federal knew of the details of the Jones-to-Shanahan statement prior to Federal's issuance of the denial letter. This information was necessary to provide the proper foundation for the admission of the Shanahan testimony. This point was discussed at great length before the trial court. A portion of the record below will clarify the question:

Q. With regards to the planning of the burglary, could you relate to the jury what Bobby Gene Jones told you in July and in October of 1982?

MR. HELLMAN: Your Honor, I believe that Mr. Jones has been here to testify, and, therefore, this would be additional hearsay to the testimony he has already given in this court. I object to the question as hearsay.

THE COURT: Come up.

(Counsel approached the bench and the following proceedings were had:)

THE COURT: All right. The record should reflect that Court and counsel have had extensive conversations regarding this very issue off the record and it probably would be very well in view of Mr. Hellman's objection to place on the record the reason that I'm going to overrule Mr. Hellman's objection and the limitations, the limitation within which the testimony will be received.

It's my understanding that defense counsel is offering this for the purpose of showing their state of mind and their knowledge of these facts when they denied Mr. Krigel's claim in March of '83; is that correct?

MR. YERETSKY: That's correct.

MR. HELLMAN: Your Honor, I think if the Court is permitting them to do it, I think there has to be a ground work showing that they knew of the contents of the statement, and I don't think there has been anything such as that. I just thought they were trying to find out how they get in the statement which merely is hearsay as compared to what Bobby Gene Jones has testified to here in open court. If they're try-

ing to show that they had some knowledge of the contents in this statement, why, I think they have to show the ground work that they had it. So far we don't know of any contact between the FBI, that statement, and Federal Insurance Company.

THE COURT: What Mr. Hellman says is true. That's called foundation.

MR. HELLMAN: Yes, I'm sorry. I couldn't find the word.

THE COURT: What is the foundation which would render this testimony relevant of the issue of defendant's state of mind?

MR. YERETSKY: We were told, through Schlatman, through Nau, that Mr. Krigel was involved in the planning of the burglary. And that's part of the information we received and that's part of—goes to the state of mind on the vexatious refusal to pay. They—you know, the information came from Nau to Schlatman that there was an informant who implicated Mr. Krigel, and this witness is going to, through the statement taken from Jones in July and in August of 1982, indicate that Jones told him that Mr. Krigel was involved in the planning of the burglary and that went into the file and that information was related to Schlatman. And Schlatman related it to the company.

So for that limited purpose, and to show, again, going to the state of mind of the insurance company, they did receive that information. And we're entitled to show where it originated from and when it originated.

MR. HELLMAN: Federal Judge Ross Roberts gave me permission to interview this witness informally in lieu of a deposition, and I did that at noon break today, and he told me that he didn't never speak to Schlatman about any of the contents of the file. So it's really—there is going to have to be another chain. I mean, assuming he says the same thing on the stand now that he told me in the informal interview. He didn't talk to Schlatman. I think Schlatman pumped this information from Nau and Nau wasn't on the file, as I understand it, that's what the deposition that we took said, so I think you ought to require that they make a foundation before they get

into this information as to how they received it. I don't think they can show they received this information, at least from what informal and deposition evidence is at this point.

THE COURT: I think they've already shown, that the insurance company has already shown that they received this information.

MR. HELLMAN: In what way, Judge?

THE COURT: And that was through the testimony of Schlatman. Okay. Now, the relevant inquiry and relevant issue with respect to that, or should I say a sub issue, is the reliability of the information and receipt of the information which I think, Mr. Hellman, you—somebody has mentioned at some point during this trial. And I'm not sure whether it was on the record, off the record, in opening statement or just where it was. So with respect to the foundation, let's see, what do we have? We have Mr. Crowley receiving the report from Leamon regarding this; we have—

MR. HELLMAN: Not the statement, Judge.

THE COURT: Pardon me?

MR. HELLMAN: Not the statement

THE COURT: I'm talking about Mr. Krigel's involvement in the burglary.

MR. HELLMAN: There is nothing in his report.

THE COURT: Isn't that in some of his reports?

MR. YERETSKY: It goes from Schlatman to Leamon and to Crowley.

MR. HELLMAN: Leamon doesn't—Leamon's reports are absolutely void of any of this.

THE COURT: You mean Schlatman contacted Crowley directly?

MR. YERETSKY: Schlatman contacted Leamon and he also contacted Crowley.

MR. HELLMAN: Can I ask a question preparatory to objection? The Schlatman contact—

MR. YERETSKY: He doesn't have any.

MR. HELLMAN: That's right.

THE COURT: That's all right.

MR. HELLMAN: Can I ask that?

THE COURT: Here is the point. It doesn't matter. It's of relevance how the insurance company obtained this information to bear on the issue of the reliability of the information and their reasonableness in relying upon it. But it's also relevant that they received the information.

MR. HELLMAN: I have no objection to that.

THE COURT: Regardless of how they received it, you see.

MR. HELLMAN: Well, Judge, this witness has told me and I would like permission to ask him if he gave any of this information to Schlatman. The answer I think will be no, at least that's what he told me at noon. Now, if we can cut that handle off, then this witness can't—

THE COURT: He's already said that he didn't contact Schlatman.

MR. YERETSKY: The point with this witness is he took a—got the information, put it in his file and we got the information and it came from Schlatman.

MR. HELLMAN: It came from Nau to Schlatman and that's where Nau's deposition becomes vital, and that's what I'm saying. I don't mind that they tie it, but they can't tie it to this man because he didn't do it.

THE COURT: Well, if they think they can establish the proper foundation through later witnesses and assure me that they can do that, I'll take them at their word you can do it.

MR. YERETSKY: We can, again, show through Schlatman that he received the information from Nau. Nau gave the information to Schlatman, and it goes back to Leamon and Leamon to Crowley, okay.

THE COURT: Okay. I got all that. That's already in evidence.

MR. HELLMAN: That's not quite so, because Nau's deposition isn't in evidence yet, but—

THE COURT: Yes, it is, because Schlatman said he got the information from Nau.

MR. HELLMAN: Okay. I'm not contradicting that. I'm not contradicting that. Nau gave it to Schlatman, I think that's about where they got it, but this witness doesn't have anything to do with that, only that he generated the statements.

THE COURT: And put it in the file.

MR. HELLMAN: And put it in the file.

THE COURT: And what are you asking?

MR. YERETSKY: I'm asking what Bobby Gene Jones told him.

THE COURT: Okay.

MR. HELLMAN: But that's why it's just plain hearsay and irrelevant because they don't tie it to their knowledge. That's the objection. There is a limited area of their knowledge which is an exception to the hearsay rule, and they don't have the foundation to show that what he did or that the file contains—anything that's contained in Bobby Gene Jones' statement is not admissible because it's hearsay unless it fits under the exception—that is, their state of mind—and their state of mind did not come from that transaction, it came from another transaction.

THE COURT: Well, the link which resulted in a particular state of mind maybe tenuous, all right, but somehow or another I think it's undisputed that the insurance company did obtain the information. Now—

MR. HELLMAN: Judge—

THE COURT:—it may go to the weight—

MR. HELLMAN: Well, it goes to quantity.

THE COURT:—of the evidence.

MR. HELLMAN: They did not obtain the information. They did not obtain the statement. All they obtained through Nau's deposition, speaking of Schlatman, is there is (sic) an investigation involving Krigel. They didn't—they don't have the sum total of this statement that they're now trying to introduce. They—what they got what was (sic) Nau told Schlatman. Schlatman has already testified to one little remark; that is, that Krigel was involved in some way. That's all Nau's deposition says.

Now, to seek to—and that's all that got through to create a state of mind. Now

what they're trying to do is fill in that all of this was in the file, but it didn't get to them. Why would that go to their state of mind? It never got to them. All that got to them is that one little statement, Ed Krigel is being investigated. Now, sum total, quit.

THE COURT: I don't think that was the testimony. I think the testimony was that Ed Krigel was involved in the burglary.

MR. HELLMAN: Okay. But that is not all the detail. That's not all the details of two statements. They take that statement Ed Krigel was involved in some way and they're trying to amplify the knowledge through this witness who did not divulge that information to anybody that Federal got the information from. Federal only got the information from Nau, who said one little sentence, and Schlatman, who just testified he said one little sentence, but now they're trying to bring out the entire statement which is all hearsay and does not go to their state of mind.

THE COURT: Well, again, I say, that has to do with the weight and the quality of the investigation that they made and the reasonableness of that is for the jury, but it is not any grounds for exclusion of the testimony. It may be that you can complain that their investigation was unreasonable because it did not obtain all of the details and, therefore, their state of mind was improper.

The objection by Krigel continued, and the following discloses in further detail the issue:

MR. HELLMAN: Not only do I complain, but I'm demonstrating to the Court there was no chain of information between the statements and the Federal Insurance Company.

THE COURT: He says he can supply a chain.

MR. HELLMAN: Well, I don't know how he's going to do that. He hasn't advised the Court yet, and I'm objecting to the lack of foundation. This is a very critical point. And we know what Nau says.

THE COURT: What does Nau say?

MR. YERETSKY: Nau says that he related to Schlatman that there was an informant or that Krigel was involved in the planning of the burglary and that that's what he told Schlatman.

MR. HELLMAN: Page 16, line 5. I'll show you Nau's deposition, Your Honor.

Waldeck: "And at the time that he called you, what was the purpose of the call to you," that is, Schlatman calling Nau.

"Answer: To make inquiry concerning what, if any, information on the burglary of Krigel's.

"Question: What, if any, information did you provide him?

"Answer: When asked by Mr. Schlatman, I advised him that Mr. Krigel was the subject of an FBI investigation.

"Question: Do you recall any other parts of the discussion, Mr. Nau?

"Answer: No, I did not.

"Question: All right. Did you disclose any other details concerning the FBI investigation to Mr. Schlatman at that time?

"WITNESS: To the best of my knwoledge (sic), I did not."

That's Nau's testimony. Then I think that's about the end of it. Let me see if there is anything else.

Page 17, line 10: "All right. Did you subsequently, on an occasion or two, have—receive further inquiries from Mr. Schlatman before you transferred to Cleveland about the status of the investigation?

"WITNESS: I believe I did, but the exact content of the exact content of the calls, I don't specifically remember.

"Question: Do you remember the general nature of whether it was a continuing inquiry or some other subject matter or what it was, Mr. Nau?

"Answer: General continuing inquiry concerning the FBI's—the status of the investigation concerning the aforementioned burglary.

"Question: All right. Mr. Nau, are you presently working full time or are you on leave?"

So that was the end of it. So there is one time at page 16, line 5, of Nau's deposition which is the crux, he said, "When asked by Mr. Schlatman, I advised him that Mr. Krigel was the subject of an FBI investigation." That's the sum total. Now—

MR. YERETSKY: That's the whole crux of the situation.

MR. HELLMAN: But that is not—we have a statement, we know the contents of the statement. The statement contains thus, thus and thus. It's merely that one little remark "Krigel is being investigated." It's just like I advised the Court. So when we have that, we can't bootstrap that into Federal's mind because Federal didn't have it. If—it's no foundation to dredge this up.

MR. YERETSKY: You've got the testimony of Schlatman already before the Court where Schlatman indicated that they told him there was an informant and the informant testified or told the FBI that Krigel was involved in it and Schlatman testified to that.

Now, this evidence is relevant because it shows that there was an informant, that it was in the possession of the FBI, and here you've got an FBI agent telling Schlatman that there was an informant back in October, November of 1982 when he and Schlatman talked. So now with regards to this testimony, it's certainly relevant to show that, yes, there was a statement in existence and they were aware of it, and that's where they all got the information to give to Schlatman kind of talking through Shanahan, or whether he went and broke into the files or whatever he did, I don't know.

THE COURT: If that's the case, why don't you limit your inquiry to in general what got into the file, which obviously Nau got a hold of in some way and—

MR. HELLMAN: I think he denies that, Your Honor.

THE COURT:—passed on to Federal.

MR. HELLMAN: Judge, I think Nau denies he got into the file. It was just word around the office as I remember it. I might be able to find that for you.

THE COURT: However he got it. It doesn't matter. The fact is he got it.

MR. HELLMAN: But he didn't get the statement.

THE COURT: You're not listening to me. I told him to state in general, keep it in general, not the details of the statement, just who it was from, the general subject of what it involved. In other words, keep it consistent with whatever Nau told Schlatman, rather than going through Bobby Gene Jones' statement in detail.

MR. YERETSKY: As I understand the Court's ruling, though, we're allowed to go into whether or not Bobby Gene Jones indicated Krigel was involved in the burglary.

THE COURT: Yes.

As Shanahan proceeded with his testimony, Krigel interposed another objection:

MR. HELLMAN: Your Honor, may I ask that that that (sic) last answer be stricken from the record? It does not fit within the knowledge of Federal Insurance Company. That statement given by Bobby Gene Jones to the FBI was not known to Federal Insurance Company prior to the time of the denial and is merely a backing and fill and amplification. It doesn't fit under the permitted limit by the Court that this was to go to show Federal Insurance Company's knowledge or state of mind at the time because they have not laid a foundation.

THE COURT: Sustained. The last part will be stricken.

As the controversy continued, the record further discloses:

MR. HELLMAN: You see, Judge, they didn't have—Federal didn't have that state of mind information. They didn't have that at the time. Nau—they said they got it from Nau, they said they got it from Nau, and we've now read Nau's entire statement and all that's said was Krigel was being investigated. That's all that was said. Now we have a rehash of what Bobby Gene Jones said to the FBI, which gives it some sort of credence. No different than —it's less credible than what Bobby Gene Jones said on the witness stand because at least he was here to be sworn. We don't know if there was any swearing in this statement. It's absolutely hearsay, and

this is pure error in letting the Federal Insurance Company bootstrap. They never had this information and now they're backing and filling and bootstrapping themselves up with it.

MR. YERETSKY: We have this very information.

THE COURT: How did you have it?

MR. YERETSKY: We had—the information was Krigel was involved in the burglary from Nau and that's what he's talking about.

MR. HELLMAN: No detail.

MR. YERETSKY: Whether it's in detail or not in detail doesn't mean that it doesn't exist in the file, or wherever he got that information.

THE COURT: Well, first we start with the premise that the statements by Jones out of court are hearsay.

MR. YERETSKY: He's already cross-examined Jones, okay.

THE COURT: That doesn't make any difference.

MR. YERETSKY: And he'll have a chance to cross-examine this witness.

THE COURT: They're hearsay regardless of which way you slice it. Now, being hearsay, it's my view that the transmission of those statements, and I'm talking about the exact statements or a reasonable summary thereof through various individuals to the insurance company, would be admissible for the limited purpose of showing that insurance company's state of mind at the time of the denial.

Now, if there are details of the statement that were not transmitted to the insurance company, then those details would not fall within the exception that I've just stated, because how could details that the insurance company doesn't know about in any way affect their state of mind? Now, are you telling me that all of this information in this degree, detail, was known to the insurance company at the time they denied the claim? Yes or no?

MR. YERETSKY: I'm telling you that the information that was known at the time they denied the claim was that there was an informant and the informant indicated that Krigel assisted in the planning of the burglary.

THE COURT: Is that all he knew?

MR. YERETSKY: That's basically what they knew.

THE COURT: Okay. Well, then, Mr. Hellman's objection is well taken and I'm going to sustain it and direct the jury to disregard the entire last answer because unless they knew it, unless the insurance company knew it at the time of the denial, it would not fall within the exception that I've stated.

MR. YERETSKY: It goes to the exception you stated because it was in the file that this person initiated or at least the report that he put in there was—goes to the time that the statement was made, goes to the consistency of the statement, and it goes to the state of mind of the insurance company to the general subject.

THE COURT: Not unless they knew it. Not unless they knew it. If you tell me they knew it, I'll permit it. If you tell me they didn't know it in this degree of detail, it could not possibly have affected their mind one way or the other. Okay? And therefore it would not have any bearing on the issue of the insurance company's state of mind, and it would be hearsay and objectionable.

MR. YERETSKY: I make an offer of proof that the July 26th, 1982, statement that's recorded as a Form 302 in the possession of the FBI and in possession of Agent Shanahan today in court would set forth the consistent testimony of Bobby Gene Jones that indicates that Mr. Krigel was involved in the planning of the burglary and that that would fall within the exception that the Court had allowed, but even the outside of the exception that the Court is indicating, we believe that the 302 form is relevant for the purpose of showing that Bobby Gene Jones made the statement that Mr. Krigel was involved in the planning of the burglary, that that statement was transmitted through the FBI to Mike Schlatman and then up through the chain to the Federal Insurance Company. And

that there was another consistent statement taken by Jones in October of 1982, which, again, would show that it was planned and assisted in by Krigel, how he did it, what he said, where various details of Jones' testimony would be corroborated and that it's relevant for all those reasons.

THE COURT: Well, the ruling still stands. You can get into the—you can get into evidence the same quality of information that was passed on to the insurance company, that is permissible regarding state of mind. But if the details of the statement didn't go to the insurance company, then I don't know of any exception to the hearsay rule that would authorize it.

MR. YERETSKY: Okay.

MR. HELLMAN: Would you instruct the jury to disregard it?

(The proceedings returned to open court.)

THE COURT: Objection will be sustained. The last answer of the witness will be stricken.

■■ Federal then suggested to the trial court that Shanahan's testimony was admissible for purposes of reliability of the information Federal had received. It was Federal's position that Shanahan's testimony was admissible because F.B.I. agent Nau had told Schlatman, who in turn told Leamon, who in turn told Crowley, that Krigel was involved in the burglary. The only problem with this proposal is that the deposition of Nau (partially disclosed above) does not disclose that Nau ever discussed Krigel's involvement or the details of the burglary with Schlatman. Nau only stated there was an on-going or continuing investigation. What Federal proposed was hearsay on hearsay. While hearsay evidence is admissible to show a state of mind, there must be a proper foundation to show the proponent of such evidence (Federal herein) had such information. In the instant case, it was necessary that Federal establish it had such information concerning the details of the Jones statement to Shanahan. The trial court initially recognized this requirement and sustained Krigel's objection. The trial court then re-

versed its position and allowed Shanahan to testify. This was reversible error.

If Federal could not establish that it knew of the details (implication of Krigel) of the Jones-to-Shanahan statement at the time it issued its denial letter, (and it could not under the facts and circumstances herein) then the details of the statement were pure hearsay and did not fall within the exception to the hearsay rule to show Federal's state of mind. The trial court should have sustained Krigel's objection when it was determined that Federal could not lay the proper foundation and thus the trial court should have excluded any testimony by Shanahan relative to the details of the Jones-Shanahan statement. Federal was required, subsequent to Krigel's objection, to show its awareness of the details of the Jones-Shanahan statement. Otherwise, Federal could not provide any basis for the admission of purely hearsay evidence. *Jordan v. Robert Half Personnel Agencies of Kansas City, Inc.*, 615 S.W.2d 574, 584–85 (Mo.App.1981).

The trial court erred in allowing Shanahan to testify as to the details of the Jones-Shanahan statement because: (1) the F.B.I. agent Nau never disclosed any details of the Jones-Shanahan statement. This nondisclosure occurred principally because of two reasons: first, because of the policy of confidentiality by the F.B.I., and second, Nau's information might have been limited because he was not even assigned to the Krigel case; (2) Schlatman stated that he never discussed the Krigel case with Shanahan; and (3) Schlatman never provided detailed information to Leamon.

There is an overriding factor herein as well. It cannot be known what influence the Shanahan testimony had on the jury. The record reveals that Jones testified. His credibility was attacked by Krigel but overall he withstood that attack fairly well. However, Jones was an admitted thief, burglar, and perjurer. When Shanahan was permitted to testify as to what Jones told him, the jury was then hearing testimony of an F.B.I. agent. The question then is what, if any, further credibility did Shanahan give to Jones?

Had Federal been able to establish a proper foundation, the testimony of Shanahan would have been admissible as a noted exception to the hearsay rule to show Federal's state of mind. Federal failed to establish the required foundation and should have been prohibited from introducing the details of the Jones-Shanahan statement. The trial court erred in failing to sustain Krigel's objection and for that reason the judgment must be reversed.

Krigel further argues that the testimony of Shanahan was inadmissible as "incompetent and legally irrelevant." These arquments need no further reference than to state they are not well founded.

■ In contrast, Federal argues that even though the Shanahan testimony might have been subject to Krigel's objection for lack of a proper foundation, the testimony was otherwise admissible (1) to reiterate Jones' declaration against penal interest; (2) to show a prior consistent statement by Jones, and (3) in that Krigel disclosed a recent fabrication, thus allowing Federal to show a prior consistent statement by Jones.

The Federal argument fails because Federal, at trial, offered the testimony of Shanahan to show Federal's state of mind at the time it issued its denial letter. On this appeal, it now proposes three different reasons to support the admission of that evidence. Such a "shift" violates the rule announced in *Williams v. St. Louis Public Service Co.*, 363 Mo. 625, 253 S.W.2d 97, 104 (banc 1952).

■ This court is mindful of the rule announced in *Smith v. Hofer, Inc.*, 701 S.W.2d 451, 454 (Mo.App.1985) which states, "If the trial court's admission of the evidence may be sustained on any ground, it does not matter what ground the parties urge in support of the court's ruling." However, Federal cannot bring the present situation within the *Smith* rule because of the following reasons: (1) The evidence was not admissible as a declaration against penal interest because Jones was available for trial and in order for such evidence to be admissible, it must have been shown that the declarant (Jones) was not available. *Moore v. Mills,* 623 S.W.2d 586, 588

(Mo.App.1981). (2) The evidence was not admissible as showing a prior consistent statement by Jones, except for those matters where Jones was impeached in his trial testimony. There must be a showing of impeachment and then the party proposing to introduce a prior consistent statement may do so only upon the matters impeached. *State v. Haggard,* 619 S.W.2d 44, 48 (Mo. banc 1981), cert. denied, 455 U.S. 930, 102 S.Ct. 1297, 71 L.Ed.2d 474 (1982). The record discloses that Jones was not impeached on his testimony relative to Krigel's participation in the burglary. It is obvious why, since Krigel would not elect to dwell on that subject before the jury. Federal had the burden of showing to the trial court the subject matter and timing of the two statements, and that the subject matter of any inconsistent statement was contained in Jones' trial testimony and thus, the prior statement was inconsistent with Jones' trial testimony. *State v. Renner,* 675 S.W.2d 463, 466 (Mo.App.1984). Federal failed to meet its burden in this regard and in fact, the record discloses no effort to even do so at trial. (3) The evidence was not admissible as a prior consistent statement on the premise that Krigel had disclosed or attacked the Jones trial testimony as a recent fabrication. Krigel's position throughout the trial was that Jones had originated the Krigel involvement from the time of his apprehension, and Krigel made no attempt, either by examination of Jones or any other evidence, to suggest that Jones had recently "fabricated" the involvement of Krigel. While on this appeal Federal claims that the record discloses the "recent fabrication" claim, Federal's position is not supported by the record.

Simply stated, the trial court erred in failing to sustain Krigel's objection (on the basis of hearsay) to the Shanahan testimony. While Federal claimed before the trial court that said testimony was admissible (even though hearsay) to show Federal's state of mind at the time of the March, 1983, denial letter, such evidence would be admissible as an exception to the hearsay rule providing Federal had laid the proper

foundation for the admission of evidence. Federal failed to do so. Further, as noted above, the result of the matter was that Shanahan, as an F.B.I. agent, was permitted to testify as to what Jones had told him some five to six months following the burglary. There is no way to assess the jury's evaluation of the Jones testimony separate from the bolstering effect the Jones testimony might have received by being stated through Shanahan.

For the above reasons, Krigel's point (1) is sustained to his favor.

As noted above, this court has elected to address all of the points presented by Krigel. The purpose is to alert the parties and the trial court to avoid the commission of like errors and to render void any assertions that claimed errors still prevail if the matter should proceed to a retrial.

■ Under his point (2), Krigel charges that the trial court erred in sustaining Federal's objections to certain interrogatories which sought disclosure of certain factual support for Federals' affirmative defense. This issue has been rendered moot upon the trial of this matter and the evidence disclosed during trial. The issue no longer exists and therefore should not be a matter in controversy if this cause is retried.

■ Under his point (3), Krigel charges the trial court erred in refusing to submit (during trial) a withdrawal instruction in conformity with MAI 34.02. This issue has also been rendered moot because if this matter is retried, then the instructions submitted by the trial court must conform to MAI and be supported by the evidence and circumstances applicable to any particular instruction. This court does not have to remind the trial court of its responsibility relative to the submission of instructions.

■ Under his point (4), Krigel charges that the trial court erred in waiting until the last day of trial to declare that the policy of insurance herein disputed was not ambiguous, as the delay of the ruling permitted Krigel to submit evidence on the expectation that the policy limit was $613,-909.90.

The expectation factor and the manner in which any evidence was introduced by Krigel relative to his claim is no longer of any import and only relates to what his evidence might be and the manner of its introduction in any future proceedings.

■ On the question of the ambiguity of the policy, that point is ruled against Krigel. The following illustrates why the trial court was correct in its ruling that the policy was unambiguous. The policy in dispute is what is commonly called an "all risk jeweler's block policy." Section 2A of the policy prescribes the maximum limits of the policy and reads:

### LIMITATIONS OF LIABILITY

2. The maximum liability of the Company resulting from any one loss, disaster or casualty is limited to (A) $370,000 in respect of property at the Insured's premises as described herein; ...

The maximum limit payable on any one loss is $370,000.00. This $370,000.00 limit was (by endorsement) raised to $470,000.00 for a four-month-holiday period. This increased amount is not relative to the present case. This policy also contained another endorsement which amended the inventory figures originally provided Federal through Krigel's application for renewal. This endorsement did not change or alter the maximum limit of the policy of $370,000.00. In the application for renewal, there is paragraph 17A, which discloses Krigel's claimed inventory as of December 31, 1980 and values that inventory at $306,-994.00. Paragraph 17A does not alter or even suggest any increase of the maximum limit of the policy. The endorsement above changed the Krigel inventory (bank values) from $306,994.00 to $613,989.80. The endorsement itself contained the printed phrase, "All other terms and conditions remain unchanged." The point, once again, is that this endorsement did not change or alter the maximum limit of $370,000.00. It is also noted that Krigel, just prior to the loss, received in writing further verification of the maximum limit of $370,000.00. The trial court afforded Krigel every opportunity to show any ambi-

guity within the policy and to establish his second theory of "reasonable expectation."

On the question of ambiguity, the trial court was correct in declaring that the contract was unambiguous. In the first instance, the policy, in unequivocal terms, sets the maximum limit of $370,000.00. The endorsement merely references the increase of the inventory or stock book value to $613,989.80 and does nothing to alter the maximum policy limits. The law is clear that endorsements within or applicable to policies of insurance do not change or limit the policy terms except as such change or limit be specifically set forth in the endorsement. *Swift & Co. v. Zurich Insurance Co.*, 511 S.W.2d 826, 832 (Mo.1974).

The effect of the endorsement was to provide 100% appreciation of any item covered under the policy, but not to exceed the total of $370,000.00 for any one loss.

There was no ambiguity within the terms of the policy, nor was there any created by the endorsements attached to the policy.

 Krigel's claim of "reasonable expectation" of coverage for the sum of $613,989.80 does not apply, because both the maximum limit of the policy and the extent of appreciation coverage to a maximum of 100% were subject to negotiation between Krigel and Federal before the policy terms were agreed to and formalized into the policy and the endorsements. The terms of the policy are unambiguous and the policy must be enforced according to its terms. *Robin v. Blue Cross Hospital Service, Inc.*, 637 S.W.2d 695, 698 (Mo. banc 1982). Krigel's claim that the disputed policy was an adhesion contract is not supported by the evidence. Krigel attempts to bring his claim within the rule announced in *Estrin Construction Co., Inc. v. Aetna Casualty & Surety Co.*, 612 S.W.2d 413 (Mo.App.1981). In *Estrin*, this court stated, "In a contract of adhesion, however, the terms are imposed by the proponent of the form: they are not expected to be read and even if read, the adherent has choice only to conform." *Id.* at 419.

While Federal was the "proponent of the form", the evidence also reveals the following: Krigel met with his agent Atlas to discuss the policy and its renewal. Krigel was advised as to alternative forms of insurance he could purchase, i.e., an item-by-item valuation of his entire stock to affix an actual value of the stock for coverage purposes or by a 50%, 75%, 100% appreciation coverage and Krigel, by his own action, opted for the 100% appreciation coverage. In addition, Krigel was advised by Atlas that the maximum coverage would be $370,000.00, except as to any major loss during the four-month holiday period, then the maximum would be $470,000.00. In addition to the particular coverage (appreciation coverage), the evidence was clear that Krigel could have, upon payment of increased premium, raised the maximum limit of the policy and he elected the $370,-000.00 amount. The evidence also revealed that Krigel understood the appreciation factor applied to a partial loss and the maximum limit for any one loss was $370,-000.00. *Estrin* simply does not apply herein. There is no adhesion contract herein and there is no support for Krigel's assertion of reasonable expectation.

The trial court correctly ruled that the policy herein was not ambiguous and the limit therefore is set at a maximum of $370,000.00. This point is ruled against Krigel and it is herein declared that upon any retrial of this matter, the ambiguity of the disputed policy shall no longer be at issue, and the maximum limit of liability under said policy shall be $370,000.00.

 Krigel's final point asserts that the trial court erred in admitting a particular exhibit which was a "blow up" of endorsement number one to the disputed policy. He argues that this exhibit also displayed a "hypothetical paragraph" not in evidence which directed the jury's attention to paragraph 2A of the policy containing a reference to a limitation of $370,000.00.

As the record reveals, the challenged exhibit was offered and in fact admitted for the sole purpose to illustrate for the jury how an endorsement to the disputed policy would have read had the policy been construed by the endorsement as claimed by

Krigel. When Krigel objected to the exhibit, the trial court made the following ruling:

THE COURT: It's right here.

Well, it seems to me like that's the argument, whether or not the insurance policy is or is not ambiguous, and, of course, that's what your position is, and their position is the contrary, and they're attempting to, by Exhibit 44, show a hypothetical as to how it would work if your position was correct, so I'm going to overrule the objection and receive Defendant's Exhibit 44 into evidence and you can handle the situation by cross-examination.

What Krigel truly argues for on this point is an exclusive right to interpret the policy and the endorsement. When he challenged the policy as ambiguous, Federal was entitled to offer proof to refute his claim. *Cure v. City of Jefferson,* 380 S.W.2d 305, 311 (Mo.1964).

The challenged exhibit was offered to establish *absence of language within the endorsement* and to ultimately refute Krigel's claim of ambiguity. The record is quite clear that the trial court and the jury were apprised of the basis for the exhibit. Federal was entitled to offer evidence of what the endorsement meant to Federal, and the exhibit showing absence of pertinent language in the actual endorsement was material and probative of what the actual endorsement meant. The trial court has wide discretion in the admission of evidence. It cannot be said under the facts and circumstances herein that the trial court abused that discretion and hence the ruling relative to this exhibit will not be disturbed by this court. *Karashin v. Haggard Hauling & Rigging, Inc.,* 653 S.W.2d 203, 205 (Mo. banc 1983).

Krigel's challenge to the admission of this particular exhibit is ruled against him. There should be no issue presented over the admissibility of this exhibit upon any retrial of this cause as the trial court did not err in ruling said exhibit was admissible.

The judgment of the trial court is hereby reversed and the cause is remanded for further proceedings, if any, in conformity with this opinion.

All concur.